GENERAL TRADING COMPANY, INC., RESPONDENT, v.
DIRECTOR, DIVISION OF TAXATION, APPELLANT.

Argued October 22, 1979—Decided June 19, 1980.

*Harry Haushalter*, Deputy Attorney General, argued the cause for the appellant (*John J. Degnan*, Attorney General of New Jersey, attorney; *Stephen Skillman*, Assistant Attorney General, of counsel).

*Leo Rosenblum* argued the cause for respondent (*Rosenblum and Rosenblum*, attorneys).

The opinion of the Court was delivered by

WILENTZ, C. J.

This extended controversy between the Director of the Division of Taxation ("Director") and respondent, General Trading Co., Inc. ("the taxpayer"), involves the effect on tax liability of a

taxpayer's ignorance of the tax consequences resulting from a corporate decision that had no apparent business purpose, brought no advantage to the taxpayer and caused no detriment or disadvantage to the State. Particularly at issue is the validity of a deficiency assessment levied under the Corporation Business Tax Act (*N.J.S.A.* 54:10A–1 *et seq.*) and the procedural requirements for an appeal to the Division of Tax Appeals. The assessment was based on the number of shares which the taxpayer was authorized to issue on April 30, 1969, the last day of its 1968 fiscal year. The Division of Tax Appeals overturned the deficiency assessment and entered judgment in favor of the taxpayer. The Appellate Division affirmed. We granted the Director's petition for certification.

General Trading Co., Inc., is a closely-held domestic corporation engaged in the wholesale distribution of food products. In April 1969 the company's authorized capital structure consisted of 5,000 shares of Class A stock and 1,000 shares of Class B stock. On April 28, the stockholders and board of directors held a special meeting at which they eliminated the two existing classes of stock and approved the preparation of a restated certificate of incorporation to authorize a single class of common stock consisting of ten million no par shares. The attorney who represented General Trading filed the restated certificate of incorporation with the Secretary of State on April 30, 1969, the final day of the taxpayer's fiscal year.

Under section 5 of the Tax Act, as it existed in 1969, the annual corporate franchise tax was determined in part from the taxpayer's net income during its preceding fiscal year. To this amount was added a figure taken either from a schedule based on the taxpayer's net worth or from a schedule based on the number of its authorized shares, whichever yielded the greater amount.[1] In this case it is undisputed that the amount based on

---

[1]Under the statute as amended by *L.* 1970, *c.* 93, § 1, the authorized share schedule is now used only where it results in an amount that is *less* than an

respondent's year-end authorization of ten million shares under section 5(e)(ii) exceeded the amount based on respondent's net worth under section 5(a).

On June 19, 1969, while preparing the corporation business tax return, the taxpayer's accountant realized that by increasing the number of authorized shares to ten million on the last day of the fiscal year, the taxpayer had incurred a substantially greater tax liability than would have obtained under the net worth schedule. After he related this information to the taxpayer's attorney, another special meeting of the directors and shareholders was held and the certificate of incorporation was amended to reflect a reduced authorization of 100,000 shares.

On that same day, the taxpayer's attorney telephoned the supervisor of the Corporation Tax Bureau of the Division of Taxation. The attorney explained that the company had inadvertently increased its capitalization to ten million shares instead of to 100,000 shares and asked the supervisor how to proceed. He was advised to submit an affidavit explaining the error together with the company's tax return and a check for the amount due. Basing its calculations on the reduced authorization of 100,000 shares, the corporation computed its franchise tax at $13,553 and filed its return with the supervisor, together with the requested affidavit and a letter reminding him of the earlier telephone conversation.

There matters stood until September 1972, when the taxpayer received a letter from the Tax Division stating that additional taxes were owed based on the Director's finding that the taxpayer was authorized to issue ten million shares on the last day of its 1968 fiscal year.[2] In February 1973, following a confer-

---

amount based on the total assets of the corporation. *See N.J.S.A.* 54:10A–5(e)(ii)(bb); *see generally N.J.A.C.* 18:7–1.1.

2We note in passing that *N.J.S.A.* 54:10A–5(e)(ii) does not specify whether reference is to be made to the number of shares authorized as of a particular

ence with the supervisor, the taxpayer was advised by letter of the Tax Division's final determination to assess an additional $26,369.79 in taxes, plus interest. In addition to stating that payment was required within 30 days, the letter informed the taxpayer of its right to take an appeal pursuant to *N.J.S.A.* 54:10A–19.2, and set out the requirements of that provision. The taxpayer promptly filed an appeal with the Division of Tax Appeals but neither paid the additional tax nor posted security, steps which the Director contends are alternative requirements for an appeal under section 19.2.

Through testimony of the attorney who prepared the restated certificate of incorporation and the accountant who recommended the subsequent reduction in General Trading's authorized capitalization, the taxpayer attempted to show that there was no identifiable business purpose behind the initial decision to authorize ten million shares for this closely-held corporation. Characterizing the choice of a ten million share figure as arbitrary and inadvertent, the taxpayer argued that the restated certificate of incorporation should not result in additional tax liability but should be treated in the same manner as a clerical error appearing on a tax return. The judge of the Division of

---

day during the base year or to some other measurement, *e. g.*, the average number of shares authorized during the base year. However, *N.J.A.C.* 18:7–3.4(a) provides for computation of the tax based on the number of shares authorized "as of the close of the calendar or fiscal accounting period covered by a return . . ." and the taxpayer has not questioned the validity of this administrative construction of the statute. *Compare N.J.A.C.* 18:7–8.6 (value of taxpayer's real and personal property for alternative tax under *N.J.S.A.* 54:10A–5(e)(i) construed to mean average value on a quarterly basis). Of course, any argument that averaging is also required under 5(e)(ii) would have to take into account the Director's broad authority to formulate rules designed to effectuate practicable enforcement of the statute. *N.J.S.A.* 54:10A–27. Moreover, to invalidate the year-end rule at this date might well be unfair to those who have relied on this rule and the benefits, if any, of such a holding would be unavailable to most taxpayers since the time for appeal has long since passed.

Tax Appeals apparently agreed. He acknowledged that the statute did not authorize the Director to ignore the tax consequences that result from a formal increase in authorized shares, but reasoned that the broad administrative authority to correct mistakes extended to cases involving inadvertence and excusable neglect. Concluding that the taxpayer's choice of ten million shares resulted from excusable neglect or inadvertence, the judge reversed the additional assessment and entered a judgment affirming the amount of tax originally paid by General Trading.

The Appellate Division affirmed, in an unreported decision, reasoning that the record amply supported the tax judge's conclusion that the decision to authorize ten million shares was an honest mistake of judgment which should not result in additional tax liability.

We granted certification to determine whether liability under this statute may be avoided where a corporate taxpayer belatedly realizes the adverse tax consequences of its business decisions. Before turning to that issue we must consider whether taxpayer's failure to post security for the disputed tax deprived the Division of Tax Appeals of jurisdiction to hear this appeal, a contention raised by the Director, rejected by the Division of Tax Appeals, and not addressed by the Appellate Division.

## I.

We begin with the premise that "[t]he right of appeal to the Division of Tax Appeals is purely statutory and the appellant is required to comply with all applicable statutory requirements." *Hackensack Water Co. v. Division of Tax Appeals*, 2 *N.J.* 157, 164 (1949). *See also City of Newark v. Fischer*, 3 *N.J.* 488 (1950); *Clairol, Inc. v. Kingsley*, 109 *N.J.Super.* 22, 25 (App.Div.1970), aff'd o. b., 57 *N.J.* 199 (1970), app. dism., 402 *U.S.* 902, 91 *S.Ct.* 1377, 28 *L.Ed.2d* 643 (1971). It does not

follow, however, that every procedural omission rises to the level of a fatal defect in subject matter jurisdiction regardless of the attendant circumstances so as to deprive the taxpayer of any opportunity for review or to render void any ensuing judgment. Rather, a review of the cases demonstrates this Court's reluctance to raise a jurisdictional bar where the omission results from justifiable reliance on prior decisional authority, *Boys' Club of Clifton, Inc. v. Township of Jefferson,* 72 *N.J.* 389, 405–06 (1977), or where the irregularity may be cured without undue delay or irreparable harm to the other party, *Hackensack v. Rubinstein,* 37 *N.J.* 39, 51–52 (1962); *Roadway Express, Inc. v. Kingsley,* 37 *N.J.* 136, 141–42 (1962).

This aspect of the case, then, involves a two-step analysis. First it must be shown that the statute requires the taxpayer to post security in order to perfect an appeal. Only if that showing were made would it be necessary to consider whether the failure to post security deprived the Division of Tax Appeals of subject matter jurisdiction under the circumstances here presented. For the reasons stated below we conclude that the statute does not require the posting of security and we therefore need not reach the second question.

The statutory authority for an appeal under the corporate franchise tax is contained in *N.J.S.A.* 54:10A–19.2. Subsection (a) of that section provides as follows:

> Any aggrieved taxpayer may, within three months after any decision, order, finding, assessment or action of the director made pursuant to the provisions of this act, appeal therefrom to the division of tax appeals, by filing a petition of appeal with said division in the manner and form prescribed by the said division and on giving security, approved by the commissioner, conditioned to pay the tax heretofore levied, if the same remains unpaid, with interest and costs.

Standing alone, this provision lends support to the Director's contention that two requirements must be satisfied within the three month time limit: (1) the filing of a proper petition and

(2) the posting of security approved by the commissioner to cover any unpaid taxes, interest and costs. The next subsection, however, suggests that a failure to post security does not defeat the appeal but will expose the taxpayer to collection and enforcement of the unpaid tax:

> No such appeal shall stay the collection of any tax or the enforcement of the same by entry as a judgment, unless by order of such division, and then only after security approved by the director of said division has been furnished to the commissioner. . . . [*N.J.S.A.* 54:10A–19.2(b)].

This subsection presumes that an appeal might be filed pursuant to subsection (a) without payment of the full tax or posting of security. In such a case, the State is authorized to enforce the disputed tax by entry of a judgment and an order to stay enforcement of the judgment may issue only after security has been approved and furnished to the commissioner. If posting security were a prerequisite for a timely appeal under subsection (a), the collection and enforcement remedy provided in subsection (b) would be surplusage. Such a construction should be avoided. *See Toms River Water Co. v. New Jersey Board of Public Utility Commissioners*, 82 *N.J.* 201, 211 (1980); *Peper v. Princeton Univ. Bd. of Trustees*, 77 *N.J.* 55, 68 (1978).

 The Director contends, however, that the Legislature included the prepayment and security provisions in order to ensure that the State would not be deprived of substantial revenues pending the outcome of tax appeals. This argument is wide of the mark. We have no doubt that the Legislature may require a corporation "to pay taxes now and litigate later." *N.Y. Susquehanna & W.R.R. v. Vermeulen*, 44 *N.J.* 491, 501 (1965). Here, however, it has not done so. *N.J.S.A.* 54:10A–19.2 permits the taxpayer to post security as an alternative to prepayment of the tax or as a prerequisite for an order to stay collection of the tax. In neither case would the State be in receipt of funds until the final disposition of the appeal. Thus, it is reasonable to infer that the State's financial security is

adequately protected so long as the State is free to collect any unsecured amount pending the outcome of the appeal. The burden on the State in this case was no greater than it would have been had respondent's petition of appeal been accompanied by security which the Director deemed inadequate. In either case the Department is free to have judgment entered and enforced under subsection (b) notwithstanding "such appeal."

Whatever ambiguity inheres in the statutory language is adequately resolved for present purposes by the Department's own rules which "[i]f valid, . . . have the force and effect of law." *Hackensack v. Rubinstein, supra*, 37 *N.J.* at 45. *N.J. A.C.* 17:18–1.23 provides that appeals from the provisions of the Corporation Business Tax Act shall be filed within three months of the challenged decision "by filing a petition of appeal with the division . . . and on giving security pursuant to the provisions of *N.J.S.A.* 54:10A–19.2 *if it is desired that such appeal act as a stay to the collection of the tax.*" (Emphasis added). The plain import of this regulation is that a taxpayer's failure to post security for the amount of tax in dispute simply entitles the Director to pursue the collection and enforcement remedy provided in *N.J.S.A.* 54:10A–19.2(b).

Since the Director has not challenged the validity of this regulation, one which fully supports our analysis of the statutory language, we conclude that the security provisions of *N.J.S.A.* 54:10A–19.2 are not prerequisites to filing a proper appeal with the Division of Tax Appeals.

It is conceded that in this case the Director never sought to enforce the additional taxes under the very provision which, by providing for summary enforcement, facilitates their collection pending the outcome of an appeal. Even if the Director had pursued this remedy, however, the tax judge has no authority under *N.J.S.A.* 54:10A–19.2 to dismiss an appeal for failure to

provide security for the challenged tax. Accordingly, the tax judge properly denied the Director's motion to dismiss.[3]

## II.

On the merits, the question is whether an increase in the number of authorized shares sufficient to trigger *N.J.S.A.* 54:10A–5(e)(ii) may be accomplished on the final day of the taxpayer's fiscal year without incurring additional liability given the circumstances here involved. If the circumstances do not warrant a departure from the statutory scheme, then the Director's determination must be reinstated for it is undisputed that the·deficiency assessment reflects a correct application of the schedule in *N.J.S.A.* 54:10A–5(e)(ii) to General Trading's authorization of ten million shares as of April 30, 1969.

The taxpayer, of course, takes a somewhat different view of the issue. General Trading points to the finding by the Division judge that the choice of ten million shares was a mistake resulting from inadvertence and neglect, and contends that this factual finding should not be disturbed unless it is unsupported by substantial evidence in the record. In our view, the decisive issue in this case involves a mixed question of law and fact relating to the nature of the alleged mistake. It is one thing to find that particular conduct resulted from inadvertence and neglect; it is quite another to conclude that corporate tax liability may be avoided simply by using such conclusory labels

---

[3]Nothing in *Lecross Associates v. City Partners*, 168 *N.J.Super.* 96 (App. Div.1979), suggests a contrary result. Unlike *N.J.S.A.* 54:10A–19.2, the tax statute involved in *Lecross* contained a prepayment requirement but was silent as to the time within which prepayment must be made. The court held that in the absence of an express time limit the jurisdiction of the County Board of Taxation could not even be questioned until the taxpayer's prepayment obligation had been crystallized by the municipality through the filing of an appropriate defense pleading, a motion to dismiss or the like. *Id.* at 99–100. That statute is not before us and we express no opinion on the correctness of the Appellate Division's analysis.

to characterize formal business decisions. Indeed, the availability of judicial relief in a given case depends in the final analysis upon the precise nature of the alleged mistake, not upon a finding that the conduct was in some sense "inadvertent." The importance of this distinction may be seen by comparing cases involving clerical errors on the part of the government or the taxpayer with those cases in which corporate officers fail, inadvertently or otherwise, to order their business affairs so as to minimize tax consequences.

In *Farmingdale Realty Co. v. Borough of Farmingdale*, 55 *N.J.* 103 (1969), for example, the taxpayer's right to a refund for excess taxes was based on *N.J.S.A.* 54:4–54 which explicitly provides for a refund where, by mistake, real or personal property has been twice entered and assessed on the tax duplicate. In that case the excess taxes had been paid as a result of a clerical error committed by the local assessor in computing the property owner's total assessment over a three-year period. The Court held that a taxpayer could demonstrate the existence of a clerical mistake under that section by comparing the figures on the tax duplicate with the raw assessment data which had been used by the local assessor but expressly declined to consider whether, in the absence of a statutory provision, similar relief from clerical assessment errors would be available on grounds of mutual mistake. *Id.* at 109–11. Since the municipality conceded the existence of a clerical error resulting in overassessment, the Court allowed recovery under the statute stating, "[i]t is only just that the municipality and not the wronged taxpayer should bear the burden of the unilateral clerical errors of an assessor resulting in the payment of taxes to which the municipality is not entitled." *Id.* at 111.

A somewhat different situation was involved in *Mayor and Bd. of Aldermen of Dover v. Texlite, Inc.*, 113 *N.J.Super.* 315 (App.Div.1971). There the taxpayer sought a reduction in the personal property taxes assessed against a recently acquired subsidiary on the ground that the taxable inventory figure on

the subsidiary's return was based on a year-end raw material figure instead of the average raw material inventory throughout the preceding year. The Division judge accepted this testimony and reduced the assessment based on his finding that office personnel had erred in computing the original return. *Id.* at 319. On appeal by the municipality, the Appellate Division vacated the judgment and remanded the case on the ground that even if the taxpayer's theory of inventory valuation were correct, the record did not contain proper or adequate supporting proof of the asserted mistake. The court found the proof inadequate because the corporate representative who testified before the Division of Tax Appeals had no personal knowledge concerning the subsidiary at the time the original return was filed and offered no company records to support his conclusory assertion that the figure appearing on the return reflected only a year-end inventory. The court also held that the tax judge's finding that mistakes had been made on the original return was an inadequate ground for relief in the absence of a specific statement of what those errors were or other findings explanatory of the judgment.

An analogous situation might exist under the Corporation Business Tax Act if the taxpayer's return incorrectly reported an authorization of ten million shares. In that case, presumably, the taxpayer would be entitled to correct the return upon proof that its certificate of incorporation authorized the issuance of only one hundred thousand shares. Such proof would establish a material discrepancy between the true state of facts upon which the tax statute was meant to operate and the contrary "state of facts" set out in the return. In the absence of fraud or bad faith, nothing in the cases suggests that the availability of relief depends on a showing that the incorrect figure resulted from an inadvertent slip of the pen rather than an intentional but mistaken report of the facts.

Unlike the taxpayer in *Farmingdale Realty*, however, General Trading does not claim to be the victim of a governmental

assessment error. And unlike the situation in *Texlite* or the example in the preceding paragraph, there is no claim that the ten million share figure underlying the Director's deficiency assessment exceeds the number of shares that General Trading was in fact authorized to issue as of April 30, 1969. Rather, the true nature of the alleged mistake is revealed by the taxpayer's contention that relief should be granted because the ten million share figure was allegedly "pulled out of the air" and was wholly unrelated to the limited business objective which the restated certificate was designed to achieve. At the hearing before the Division of Tax Appeals, the attorney who had prepared the restated certificate testified that he received a phone call from Louis Abad, the company's founder and father of its president, who requested that the certificate be amended so as to replace the two existing classes of stock with a single class of no par shares. Although the attorney also testified that this creation of a single class of stock, rather than the authorization of any particular number of shares, was the primary purpose behind the refiling, he offered no corporate records to support this assertion and there was no testimony on this point from any of General Trading's officers. Nevertheless, when the attorney asked how many shares should be authorized, Mr. Abad is said to have replied, "Why not ten million." Our review of the attorney's testimony leaves us with no doubt that Abad intended to authorize ten million shares, and the minutes of the subsequent corporate meeting, at which the amendment was formally approved, refer explicitly to ten million shares.

That the stockholders and officers of General Trading may not have given a moment's thought to the tax consequences of this decision is irrelevant to the question of liability under the statute. Corporate officers make business and financial decisions daily which entail tax consequences under the Corporation Business Tax Act. Decisions to retain or to sell securities or other assets, for example, may affect net worth for the purposes of *N.J.S.A.* 54:10A–5(a). Doubtless many of these choices hav-

ing a greater or lesser impact than the decision now under review are made without weighing possible tax consequences in the balance. In other instances, to be sure, tax considerations inform or even motivate business decisions. In either case the degree of tax awareness observed by corporate officers in conducting their business affairs is not the linchpin of a tax statute. Rather, as former Chief Justice Weintraub stated, "it is for the taxpayer to make its business decisions in light of tax statutes, rather than the other way around." *Household Finance Corp. v. Director, Division of Taxation*, 36 *N.J.* 353, 362 (1962). *See also United States Steel Corp. v. Director, Division of Taxation*, 38 *N.J.* 533, 548 (1962); *General Public Loan Corp. v. Director, Division of Taxation*, 13 *N.J.* 393 (1953).

In *Somerset Apts., Inc. v. Director, Division of Taxation*, 134 *N.J.Super.* 550 (App.Div.1975), seven partners formed a corporation simply to hold title to an apartment complex as their nominee so as to facilitate a loan transaction. The new corporation, however, did not include the land and buildings comprising the apartment complex among its assets in its Corporate Business Tax returns, apparently on the assumption that these assets remained attributable to the partnership. Thereafter, the Director imposed a deficiency assessment based on his determination that the apartment complex was an asset of the new corporation for the purposes of *N.J.S.A.* 54:10A–5. This assessment was vacated by the Division of Tax Appeals on the ground that the land and buildings were not assets of the corporation. The Appellate Division reversed and reinstated the assessment, holding that where the taxpayer voluntarily chooses to use the corporate structure to own property and conduct business, it cannot thereafter deny its existence in order to avoid the corporate franchise tax consequences of that decision. *Id.* at 555–56. If the partners had known that the corporate form would be recognized for state tax purposes notwithstanding the Internal Revenue Service decision to disregard the corporate

form for federal tax purposes, they might have chosen to forego incorporation. But it is clear that the Appellate Division's holding did not turn on a finding that the partners had given careful, albeit, mistaken, consideration to the state tax consequences. Had the corporate form been "pulled out of the air," the result, presumably, would have been the same.

General Trading also contends that the terms of *N.J. S.A.* 54:10A–5(e)(ii) should not be applied because there was no ascertainable business purpose for its authorization of ten million shares.[4] It has cited no authority for this novel proposition. Even assuming that the creation of a single class of stock was the only business objective underlying the restated certificate of incorporation, the fact that this objective could have been accomplished without triggering increased liability under *N.J.S.A.* 54:10A–5(e)(ii) by authorizing a smaller number of shares is simply irrelevant to liability under the statute. In our view the legal principle which governs this case is that a voluntary business decision "is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred." *Commissioner v. National Alfalfa Dehydrating and Milling Co.*, 417 *U.S.* 134, 148, 94 *S.Ct.* 2129, 2137, 40 *L.Ed.2d* 717, 727 (1975).

> This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not . . . , and may not enjoy the benefit of some other route he might have chosen to follow but did not. "To make the taxability of the transaction depend upon the determination

---

[4]While our opinion addresses this contention as if the taxpayer had established the absence of any business purpose for its choice of ten million shares, we noted above that none of the corporate officers testified on this point. Moreover, there has been no suggestion that General Trading *had* a business purpose for the choice of any particular number of authorized shares. In fact, the only apparent purpose behind General Trading's eventual choice of one hundred thousand authorized shares was to avoid *further* taxation under section 5(e)(ii).

whether there existed an alternative form which the statute did not tax would create burden and uncertainty." [*Id.* at 149, 94 *S.Ct.* at 2137 (citations omitted)].

The same rationale was expressed by this Court in *Household Finance Corp., supra,* 36 *N.J.* at 363:

> Moreover, taxation is an intensely practical thing, and the administrative burden may well be too much if a state must explore the ramifications of corporate structures to determine the justice of recognizing or ignoring corporate entities in each factual complex.

To those who are not versed in tax counseling or administration, application of these principles may seem harsh. But we are persuaded that to adopt a contrary rule in this case would have unacceptable consequences. Such a rule would require the Director to determine in each case where the question is raised whether there existed a readily apparent business purpose for a particular corporate decision and whether the corporate officers or their advisors were aware of the tax consequences at the time such decision was made legally effective. To make taxation turn on the outcome of such burdensome inquiries into such subjective criteria (which are susceptible to rationalization after the fact) would be unwise in theory and unworkable in practice. For example, a question arises whether the rule would support an assessment based on the existence of a *conceivable* business purpose, or whether it would be necessary to find that the corporate action substantially furthered an important business purpose. Similar distinctions would be necessary to determine the degree of tax awareness sufficient to trigger liability. While there may be a few isolated situations in which the taxpayer's state of mind is a relevant tax factor (*e. g.,* the former rules governing gifts in contemplation of death), we see no reason to adopt it as a general criterion.

Moreover, the burdens and benefits of the rule urged by General Trading would be inequitably distributed among two

classes of taxpayers: those taxpayers who are moderately well-informed, together with those who seek out competent legal advice, would be taxed even though the knowledge or advice on which they relied proved to be mistaken, while those taxpayers who disclaim any knowledge of tax law and make no effort to secure advice would escape liability. By creating legal and financial incentives for ignorance and inaction, this suggested rule would hardly advance the orderly administration of our tax system.

By contrast, the principle that a business decision will be given its tax effect according to what actually occurred promotes the public interest in tax certainty and thereby conforms with general business expectations. Indeed, planning by individuals and businesses alike would be frustrated if courts failed to give predictable effect to formal legal documents—such as the restated certificate of incorporation here involved—simply because of an asserted ignorance of the law.

■ What we have said above is also sufficient answer to the Appellate Division's observation that if General Trading had accomplished the increase in its authorized shares a day later (*i. e.*, by filing its restated certificate with the Secretary of State on the first day of its next fiscal year), there would have been no additional tax under *N.J.S.A.* 54:10A–5(e)(ii) for the year in question and, so long as the taxpayer had filed a formal reduction in the number of authorized shares before April 30, 1970, all liability under that subsection could have been avoided. It is not what might have happened nor what the taxpayer could have done but what actually occurred that determines tax consequences. It is not uncommon for tax consequences to vary with the effective date of an event's occurrence. The difference of a single day may be significant, especially when—as is the case here—the difference also separates two tax years. Many taxpayers who wished they had received funds on January 1 rather than on December 31 are well aware of the phenomenon. *See U. S. Steel Corp., supra,* 38 *N.J.* at 537–41, 547–48.

In accordance with the foregoing principles, the decision of the Appellate Division is reversed, and the case is remanded to the Division of Tax Appeals (now the Tax Court) with directions to enter judgment in favor of the Director for the full amount of the deficiency assessment plus interest. Since there is no suggestion of fraud or evasion in this record, interest should be computed at 0.5 percent per month from the due date until October 1, 1975, and thereafter at 0.75 percent per month to the date of payment. *See N.J.A.C.* 18:2–2.7, 18:7–13.1(a)(4).[5]

*For reversal*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For affirmance*—None.

---

[5]*L.*1975, *c.* 177, which amended the State Tax Uniform Procedure Law, *N.J.S.A.* 54:49–11, increased the interest rate that applies to taxes or returns due on or after October 1, 1975, in cases where the Director is satisfied that the deficiency was not due to fraud or evasion.