SMALL, P.J.T.C.
The plaintiff appeals from the denial of a refund for the “mansion tax” that it paid on recording a deed reflecting the transfer of a shopping center in Mount Olive, New Jersey on September 28, 2006. Section 8 of Public Law 2006, Chapter 33 codified at N.J.S.A 46:15-7.4 made the realty transfer fee (“RTF” or “mansion tax”) of 1% of the deed price applicable to commercial properties effective July 1, 2006.[1] As part of the transition to the *208 taxation of commercial properties not previously subject to the tax the statute provided that the tax would be inapplicable to the transfer of commercial properties if (1) the deed was recorded on or before November 15, 2006 and (2) the property was transferred pursuant to a contract that was fully executed before My 1, 2006. N.J.S.A. 46:15-7.4.
In this ease plaintiff SCI ITC South Fund, LLC seeks a refund of $643,000 of the RTF that it paid pursuant to N.J.S.A. 46:15-7.2 in connection with its purchase of the shopping center property. The property consists of two commercial parcels, ITC North Property and ITC South Property, which were conveyed in a land sale contract initially entered into on September 29, 2005.
The defendant, Director of the New Jersey Division of Taxation (the “Director”), denied plaintiffs refund request due to an amendment to the land sale contract modifying the property, price, and risk allocation terms which, she contends, rendered the contract not “fully executed before July 1, 2006” as required by N.J.S.A. 46:15-7.4. (emphasis supplied.)
The parties are agreed that plaintiff is not entitled to a refund of the RTF paid with respect to the ITC North Property, because that parcel was conveyed and the deed recorded after November 15, 2006. With regard to the ITC South Property, the parties are agreed that the deed in this matter was recorded before November 15, 2006, and that the parcel at issue is Class 4A property. The parties are also agreed that had the third amendment been entered into on or before June 30, 2006, plaintiff would be eligible for a refund of the RTF paid in connection with the sale of the ITC South Property.
The parties’ remaining question is whether the July 1, 2006 third amendment to the contract materially modified the essential terms of the contract, previously amended on March 28, 2006 (the second amendment), so as to make the contract not fully executed *209 before July 1, 2006. Both parties have moved for summary judgment.
For the reasons discussed below, I find that significant and material changes to the contract were made in the July 1, 2006 amendment which rendered the contract not fully executed before July 1, 2006 and accordingly, I find that plaintiff did not satisfy the requirements of N.J.S.A. 46:15-7.4 for a refund of $643,000. Accordingly, I grant the Director’s motion and deny plaintiffs motion.
To fully understand the positions of the parties it is necessary to recite in some detail the history of the negotiations and amendments to the contract which are the subject of this dispute.
I.
The Original Contract.
On September 29, 2005, AIG Baker Mt. Olive, LLC, as seller, and Rubenstein Real Estate Co., LC, as purchaser, entered into a land sale contract (the “contract”) for the sale of two parcels of land identified in the contract as ITC Crossing North and ITC Crossing South in Mount Olive, New Jersey. The parcels are improved with an outdoor shopping center. Lowes, Sam’s Club, and Wal-Mart are its anchor tenants. The parcels were described in the contract as follows:
the parcels of land described in Schedule ¿.1.1 attached hereto (the “Fee Parcel’’) known as ITC Crossing North and ITC Crossing South in Mount Olive, New Jersey, containing approximately two hundred and thirty four thousand (234,000) square feet of leased space, approximately twenty-five thousand (25,000) square feet of space to be built, and seven (7) land leases, together with any and all •nghts and privileges and easements appurtenant thereto owned by Seller, together with all buildings, improvements and fixtures (other than fixtures owned or removable by any Tenant or third parly) located thereon (collectively, the “Improvements"; the Fee Parcel, together with the Improvements thereon, the “Real Property"); provided, however, the Fee Parcel shall specifically exclude “Pad D,” “Pad P,” and “Pad H” (as shown on the Site Plans attached hereto as Schedules J-l and J~¿) (hereafter described as the “Option Pads”), which such Option Pads will bo retained by the Seller...
[(emphasis supplied).]
The contract specified a purchase price of $99,000,000 subject to “prorations, credits and adjustments” set forth in the contract. *210 The purchase price was based on the parties’ estimates of the net operating income of the parcels; the income derived from rents of the retail space located on the property minus the associated expenses. The price was allocated to the property as follows: $12,425,000 for the portion of the property subject to Wal-Mart’s right of first refusal; $13,450,000 for the portion of the property subject to Sam’s Club’s right of first refusal; $56,000,000 for the portion of the property subject to Lowes’ right of first refusal; and $29,550,000 for the balance of the property. If Wal-Mart exercised its right of first refusal with respect to any portion of the parcels (the “Wal-Mart Pad”), then the Wal-Mart Pad would not be conveyed and the purchase price would be reduced by $12,425,000 to $43,575,000.
The contract could be executed in two or more counterparts, each of which would be deemed an original, but all of which taken together would constitute one and the same instrument. The purchaser could assign the rights and obligations without the prior written consent of the seller by written notice delivered to the seller not less than ten business days prior to closing. Any such assignment was deemed not to diminish or otherwise affect the purchaser’s obligations to pay the purchase price at closing and to indemnify the seller and the other seller parties in accordance with the terms of the contract.
II.
Amendments to the Contract.
Four amendments were made to the contract, dated November 8, 2005, March 28, 2006, July 1, 2006, and September 15, 2006. As discussed below, the first and second amendments modified the contract prior to June 30, 2006. The fourth amendment modified the contract after June 30, 2006, but only to the extent that it extended the closing date of the ITC South Property. I find that this fourth amendment did not materially change the essential terms of the contract. I find that the third amendment materially modified the essential terms of the contract which rendered the contract not fully executed before July 1, 2006.
*211 The first amendment merely extended the due diligence period to November 8, 2005.
The second amendment extended the due diligence period to April 15, 2006. It also memorialized the fact that, pursuant to Section 9.6 of the contract, the purchaser had designated SCI Acquisitions, LLC (“SCI”) as its permitted assignee. It reduced the total purchase price for the two parcels from $99,000,000 to $97,525,000, still subject to prorations, credits, and adjustments as set forth above. The reduction of the purchase price was based on a calculation of the net operating income generated by the parcels and Rubenstein’s and SCI’s determination that the credit and income from the remainder portion of the property did not support the purchase price originally assigned to it.
The second amendment also memorialized the fact that WalMart had exercised its right of first refusal and that, provided it purchased the Wal-Mart Pad, the purchase price would be reduced by $12,425,000 to $85,100,000 pursuant to the contract. It memorialized the fact that the parcels were being re-subdivided in order to create separate legal parcels for the Wal-Mart Pad, Option Pads, and a portion of the parcels that was subject to a right of first refusal held by Sam’s Club, in case the right was exercised at a future date. The description of the parcels was also conformed to remove the Wal-Mart Pad and to provide that Pad H would be included in the sale, thereby reversing its exclusion from the sale.
The fourth amendment modified the contract by extending the closing date on the sale of the ITC South Property to September 28, 2006.
The third amendment “entered into effective as of the 1st of July, 2006” modified the contract by adding legal descriptions of the re-subdivided parcels, which had not been attached to the original contract. It identified the parcels as ITC North Property and ITC South Property, which, as noted above, were previously identified as ITC Crossing North and ITC Crossing South. The parcels were described as follows:
The “ITC South PropertyLot 9.01, Block 4100 (40.7250 acres, more or less), together with beneficial easements for drainage, ingress, egress, and parking over *212 the Wetland Lots pursuant to the Maintenance Agreement set forth as Exhibit B-l hereto; and ...
The “ITC North, Property": Lot 1.02 (6.2704 acres, more or less) and Lot 1.03 (12.1294 acres, more or less), together with beneficial easements for drainage, ingress, egress, and parking over the Wetland Lots pursuant to the Maintenance Agreement set forth as Exhibit B-2 hereto.
The third amendment also established bifurcated procedures for the purchase of the parcels, in which the ITC South Property would close on September 21, 2006 (subsequently extended to September 28, 2006 by the fourth amendment) and the ITC North Property would close sometime thereafter. It specified that while the total purchase price of $85,100,000 would remain the same, $64,300,000 of the total consideration would be allocated to the purchase of the ITC South Property, and $20,800,000 to the purchase of the ITC North Property.
Further, the third amendment granted the purchaser a credit in the amount of $643,000 (1% of the purchase price for the ITC South Property) for the RTF paid on the sale of the ITC South Property, but entitled the seller to any and all refunds obtained under N.J.S.A. 46:15-7.4. The purchaser was also granted a credit of $208,000 for the RTF that it would pay on transfer of the ITC North Property. The third amendment also entitled the seller to retain title to the Wetland Lots included in ITC South Property (Lot 9, Block 4300 and Lot 19, Block 4300) and ITC North Property (Lot 1.05, Block 4105, Lot 114, Block 4100, and Lot 6, Block 20). It assigned $1 of value to the Wetland Lots, but made no adjustment for the overall purchase price that was paid for the remainder of the property being conveyed to the buyer.
III.
Contract Execution and Parties’ Contentions.
The sale of the ITC South Property closed on September 28, 2006. On that date, the property was conveyed to plaintiff, a single purpose entity established by SCI to purchase and own the ITC South Property, for $64,300,000.[2] In connection with the *213 closing, plaintiff paid a 1% RTF on the property in the amount of $643,000 pursuant to N.J.S.A. 46:15-7.2. On November 14, 2006 plaintiff filed, under N.J.S.A. 46:15-7.4, a claim for refund of the RTF it paid on the transfer of the ITC South Property.
The Director denied plaintiffs refund request. She defends that denial on several grounds. The Director argues that the third amendment made material changes to the essential terms of the contract, including: (1) first identifying the ITC South Property; (2) making significant changes in the price allocation between the ITC North and South Properties; (3) excluding the Wetland Lots from the property being transferred; and (4) transferring the risk of loss of the RTF refund to the seller which resulted in a reduction in the purchase price being paid to the seller. Because of these material changes, the Director contends the contract for the sale of the ITC South Property was not fully executed before July 1, 2006, as required under N.J.S.A. 46:15-7.4 to receive a refund of the RTF paid.
Plaintiff contends that it satisfied the requirements for a refund set forth in N.J.S.A. 46:15-7.4. Plaintiff asserts that the newly re-subdivided ITC South Property is the same parcel originally identified in the contract as ITC Crossing South, and asserts the amended identification and added legal descriptions did not materially alter the contract’s property terms. Plaintiff also asserts the closing bifurcation did not materially alter the contract’s price terms because it only allocated the total price between the ITC North and South Properties geographically but did not modify the property conveyed or the total price paid. Therefore, plaintiff argues the conveyance of the ITC South Property was “pursuant to” the contract as amended by the second amendment on March 28, 2006, before the July 1, 2006 statutory cutoff date.
IV.
Findings of Fact.
I find that the third amendment dated July 1, 2006 made material changes to the essential terms of the contract as follows:
1. It excluded the Wetland Lots from the property being transferred;
*214 2. It added a full description of the property being transferred (although plaintiff argues that precise metes and bounds are not always included in the documentation of a transfer of real estate until the deed is prepared) as well as a final allocation of price between the two separate parcels being transferred which was not evidenced in any prior amendment to the contract of sale; and
3. It transferred the risk of loss of the RTF refund to the seller on the ITC South Property and reduced the price accepted by the seller on the ITC North Property by 1% or $208,000. This resulted in a reduction in the purchase price being paid to the seller and essentially resulted in the seller’s absorption of the mansion tax.
V.
Conclusions of Law.
A. Summary Judgment
“Summary judgment should be granted where ‘the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the nonmoving party is entitled to a judgment or order as a matter of law.’ ” Alpha I, Inc. v. Director, Div. of Taxation, 19 N.J.Tax 53, 56 (2000) (citing R. 4:46-2). In Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995), our Supreme Court revised the summary judgment standard as follows:
[W]hen deciding a motion for summary judgment under Rule 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party.[3]
Thus resolution of the summary judgment motions in this case requires a determination of whether, with respect to the ITC South Property, the third amendment made significant and mate *215 rial changes to the essential terms of the contract, previously amended on March 28, 2006, so as to make the contract not fully executed before July 1, 2006 within the meaning of N.J.S.A. 46:15-7.4 and thus plaintiff ineligible for a refund of the RTF. See Wells Reit II-80 Park Plaza, LLC v. Director, Div. of Taxation, 2008 N.J.Tax Lexis 13, 24 N.J.Tax 98 (2008) (in which Judge Kuskin interpreted “the phrase ‘fully executed before July 1, 2006’ as referring to a contract signed on or before July 1, 2006, none of the essential terms of which was amended in a material respect after July 1,2006.”).
Our courts have long recognized that the “essential terms” of a contract include the parties, subject of the sale, price, and conditions of sale. See, e.g., McEnaney v. Spedick, 18 N.J.Super. 37, 40, 80 A.2d 237 (App.Div.1951) (stating a document “certain as to parties, description of the premises, price and terms ... contains the essential elements of a contract for the sale of land.”), overruled an other grounds, Kutzin v. Pirnie, 124 N.J. 500, 591 A.2d 932 (1991); Jacobson v. Lambert, 109 N.J. Eq. 88, 90, 156 A. 763 (E. & A. 1931) (stating “[i]t is well settled that the memorandum in writing of a contract for sale of lands must contain the full terms of the contract-that is, the names of the buyer and seller, the subject of the sale, the price and terms of credit, and the conditions of sale----”); Randolph v. General Investors’ Co., 97 N.J. Eq. 493, 496, 128 A. 156 (E & A.1925) (same).
I now analyze the third amendment’s modifications summarized in Part IV, supra, and discuss why those modifications materially changed the essential terms of the contract so as to render it not fully executed by July 1, 2006.
B. Modifications to the Contract

1. Propenty Description and, Exclusion of the Wetland Lots

The third amendment modified the contract by adding legal descriptions of the re-subdivided parcels, which had not been attached to the original contract. It identified the parcels as ITC North Property and ITC South Property, which, as noted above, were previously identified as ITC Crossing North and ITC Crossing South. I find, consistent with plaintiffs claim, that the ITC *216 South Property and ITC North Property refer to the same parcels identified as ITC Crossing South and ITC Crossing North in the original contract, and I find the descriptions, which add block and lot number, refer to the same ITC Crossing South and ITC Crossing North parcels. I find these amendments, when reasonably interpreted and explained, merely completed the property identifications and descriptions of the same parcels. However, because the closing was to be bifurcated, the total price had to be allocated to the two separate parcels and the second closing was to take place over eight months after the initial closing. Since the second closing deferred a payment in excess of $20 million, this materially changed the price. ($20,800,000 at, for example, 5% per annum for 8 months equals $698,333). This materially modified the contract’s essential terms.
The third amendment also entitled the seller to retain title to the Wetland Lots included in the ITC South Property (Lot 9, Block 4300 and Lot 19, Block 4800) and ITC North Property (Lot 1.05, Block 4105, Lot 114, Block 4100, and Lot 6, Block 20). It assigned $1 of value to the Wetland Lots, but made no adjustment for the overall purchase price that was paid for the remainder of the property being conveyed to the buyer. Plaintiff claims that this amendment did not materially modify the property term contained in the contract, previously amended as of March 28, 2006. The Director contends that regardless of the nominal consideration given the Wetland Lots, the exclusion of the Wetland Lots from the property being transferred was a material change to the contract’s property term. Comparing this contract to the maps submitted as exhibits to Ronald L. Carlson’s (the Executive Vice President of the Seller’s sole member) supplemental certification would indicate the following:
Wetland Lot Acres Total Acres
Total Acres ITC South 93.34
Block 4300, Lot 9 (Wetland Lot) 30.5S
Block 4300, Lot 19 (Wetland Lot) ?
Total Wetland Lots (% of Total ITS South) 30.58 (32.76%)
*217 Wetland Lot Aeres Total Acres
Total Acres 'ITC North 109.5
Block 4105. Lot 1.05 (Wetland Lot) 40.94
Block 4100, Lot 114 (Wetland Lot) 28.17
Block 20, Lot 6 (Wetland Lot) ?
Total Wetland Lots (% of Total ITC North) 79.11 (72.25%)
Grand Totals Wetland Lots(% of Both Parcels) 109.69 (54.08%) 202.84
The Wetland Lots constitute 72.25% of the land area of the ITC North Property and 32.76% of the land area of the ITC South Property. Until the third amendment to the contract of sale, there was no separate mention of these portions of the two parcels. Although plaintiff has argued that what was conveyed by the original contract was the income stream generated by designated improved pads, the contract language clearly conveyed everything except the reserved “pads” which are specifically marked on exhibits J-l and J-2 to the original contract. No reservation was made for any other parts of the property. In the third amendment the seller excluded the Wetland Lots from the sale. However, neither the Wetland Lots nor extensive areas for parking were specifically designated in the language of or the exhibits to the original contract. In the third amendment the parking lots were still conveyed to the buyers but the Wetland Lots were reserved. There is no way that these modifications in the third amendment could have been determined from the language of or the exhibits to the original contract. In particular, the reservation of the Wetland Lots but not the parking lots to the seller was indicated and defined for the first time in the July 1, 2006 amendment. Although the Wetland Lots’ value may be substantially less than the value of the improved portions of the property and the parking lots, the fact that the Wetland Lots constitute over 50% of the more than 200 acres being conveyed by the original contract make their retention by the seller for the first time in the third amendment to the contract a material change. Arguing that these over 100 acres of Wetland Lots are worth only $1 strains credibility to a breaking point. Arguing that they were not included in the *218 original contract of sale contradicts the plain meaning of the contract language and attached marked exhibits. Arguing that changing the contract to allow the seller to retain over 50% of the total land area (even if it is Wetland Lots) is not material, asks the trier of fact to ignore reality.
Absent proof to the contrary, logic would compel a conclusion that the Wetland Lots were worth more than $1, otherwise why bother to exclude them only at the time of the third amendment. To the extent that the Wetland Lots value exceeded $1 this change in terms amounted to a price increase to the plaintiff for the property it had bargained to buy before the third amendment. Although invited after ox-al ax’gument to specifically delineate and value the Wetland Lots x-etained by the plaintiff in the thix-d amendment, neither side has offered specific proof (other than the submission of maps) of the size or value (other than the nominal and unsubstantiated $1 value) of those x’etained Wetland Lots. Plaintiffs bx-ief was silent, pex-haps because of the difficulty in demonstrating that over 100 acres in a 209 acres transaction is not material. I find, consistent with the Dix’eetor’s contention, that the exclusion of the Wetland Lots fi’om the propex'ty being transferred was a significant and matei’ial change to the contract's pi’opex’ty term within the meaning of Wells Reit 11-80 Park Plaza, supra.

2. Purchase Price

The third amendment also bifui-eated the closing and allocated the total $85,100,000 consideration between the ITC Nox’th and South Px’opex’ties, $64,300,000 (75%) to the ITC South Px’opei’ty and $20,800,000 (25%) to the ITC Nox’th Propex’ty. Plaintiff claims that this amendment did not matex’ially modify the total purchase px’ice but merely allocated it between the two propei’ties based on the geogx’aphie x-edistiibution after Wal-Max*t exex-eised its light of fix’st refusal. Defendant does not dispute that the total sales price paid by the purchaser remained constant from the March 28, 2006 second amendment to the July 1, 2006 thix’d amendment.
*219 However, defendant contends, and I find, that the price terms by which the closing took place and the deeds were transferred could not be inferred from the March 28, 2006 amendment without the additional terms supplied by the July 1, 2006 amendment. For example, with regard to the ITC North Property, which was to close after November 15, 2006, the price was reduced by $208,000 as a result of the seller assuming the obligation to pay the RTF.[4] With regard to the ITC South Property, the purchaser was given a conditional reduction in price if it turned out that it was obliged to pay the RTF. Also the allocation of total purchase price to the specific parcels being transferred on two different days was not finally agreed to until the July 1, 2006 amendment. Since there is a time value to money, this allocation was not insignificant and until the third amendment was signed, no one could determine (a) how much money would be paid on each of the two dates, (b) that the grantor would assume the grantee’s statutory 1% tax obligation, and (c) which properties would be transferred on which dates. Plaintiff claims that it purchased two streams of income which came from the land, improvements, and rents from the activities conducted on the two properties. But the tax is imposed on the transfer of real estate. Although the total income flow may have been fixed by the second amendment, the allocation to each of the two parcels, sold to two separate although related entities for two specifically allocated prices on two separate days, was not fixed until the execution of the third amendment on July 1, 2006. I find, consistent with the Director’s contention, that the price allocation and price reductions were significant and material changes to the contract’s price terms within the meaning of Wells Reit II-80 Park Plaza, supra.
Plaintiff argues, as it must in order to prevail, that there was no change in the price implemented by the third amendment dated July 1, 2006 to the contract because the amount that plaintiff, the buyer, was required to pay remained unchanged. Two facts *220 defeat the logic of this argument: (1) the price the seller was to receive was reduced by a certain 1% with respect to the north parcel which would close after November 19, 2006 and by a contingent 1% if it turned out that the mansion tax became due on this transaction and (2) the mansion tax enacted and effective after the original contract and its first two amendments was imposed by law on the buyer. Had the terms of the contract not been changed, the buyer would have been obliged to pay that tax. The third amendment specifically relieved the buyer of that burden and imposed it on the seller. The shifting of a tax burden resulted in a change in the negotiated price. The buyer was relieved of any actual and potential tax burden which resulted in a reduction in its purchase price. The seller agreed to accept less. If one party assumes the tax imposed by law on the other party and without this assumption, the tax would have been imposed on the other party, that would appear to be a change in price from the situation which would have prevailed had the parties not specifically added this contract term in the third amendment.

3. Payment of Mansion Tax

It is clear that at the time of the execution of the third amendment to the contract of sale, the parties were aware of the mansion tax. Paragraph 3 stated:
3. Mansions Tax.
(a) At the ITC South Closing, Buyer will receive a credit in the amount of $643,000 (1% of the Purchase Price for the ITC South Property) for the “Mansions Tax” applicable to the sale of the ITC South Property pursuant to the recently enacted amendment to the Realty Transfer Fee law, NJSA 46:15-5 et seq.; however, Seller will be entitled to any and all refunds obtained for such Mansions Tax. Buyer agrees to assist Seller in any way possible to ensure that Seller is reimbursed from the State due to the fact that the Agreement was executed prior to July 1, BOOB and should qualify for refund per said statute. In addition, Seller will credit Buyer an additional $643,000 (1% of the Purchase Price for the ITC South Property) at the ITC South Property Closing to offset the additional Mansions Tax which will be imposed on the Buyer’s sale of the tenant in common (TIC) interests in the ITC South Property (the "TIC Credit"). However, in the event the that Buyer should, lor any reason, not have to pay the Mansions Tax upon the sale of such TIC interests (the “TIC Tax"), or Buyer should receive a refund of same, then Buyer will immediately reimburse the Seller for the TIC Credit. Buyer covenants and agrees to diligently and in good faith pursue any possible refund of the TIC Tax, and hereby agrees that the Seller shall, at its option, have the right to pursue *221 any possible refund of the TIC Tax and Buyer agrees to assist Seller in any way possible should Seller undertake such pursuit.
(b) At the ITC North closing, Seller will credit Buyer $208,000 (1% of the Purchase Price l'or the ITC North Property) to offset the Mansion Tax which will be imposed due to the fact that the ITC North Property closing will close after November 15th, 2006. {(emphasis supplied)]
Although the parties agreed that “the Agreement was executed prior to July 1, 2006 and should qualify for refund per said statute,” they can bind neither the Director of the Division of Taxation, nor this court to their self-serving interpretation embodied in the amendment. The recognition by the parties in the third amendment of their uncertainty with regard to the buyer’s obligation to pay the tax undercuts their assertion “that the Agreement was executed prior to July 1, 2006 and should qualify for a ■refund.... ” (emphasis added).
There is no question that the original agreement and its first two amendments were executed prior to July 1, 2006. Nor is there any question that the third amendment was not fully executed prior to July 1, 2006. Although there may be some limited doubt that each of the third amendment’s changes modified the essential terms of the agreement, taken together, the removal of the Wetland Lots from the property being transferred, the bifurcated closing, the precise allocation of price to specific parcels, and the absorption of the mansion tax liability by the seller constituted a material change to the essential terms of the contract. In effect the third amendment to the contract reduced the buyer’s purchase price by as much as $1,544,333.[5] Even in an $85,000,000 contract, that is material. Were it not material, would the parties have needed to introduce the language necessary to *222 accomplish these changes? They could have let the law govern and had the buyer bear the burden and risk associated with the imposition of the mansion tax. The third amendment may have increased the purchase price by the value of the Wetland Lots which for the first time were specifically excluded from the property being sold. However, the record gives no hint of how to quantify that price increase.
VI.
End Note.
Because I find the terms supplied for the first time by the July 1, 2006 third amendment necessary to a determination of the contract’s precise property and price terms, I find the July 1, 2006 amendment’s modifications material to the essential terms of the contract under Wells Reit II-80 Park Plaza, supra. Accordingly, I find that the contract entered into with the two prior amendments was not fully executed within the meaning of N.J.S.A 46:15-7.4 until the July 1, 2006 amendment. Because plaintiff did not fulfill the requirements of N.J.S.A. 46:15-7.4, it is not entitled to a refund of the RTF paid in connection with the purchase of the ITC South Property.
In General Trading Co. v. Director, Div. of Taxation, 83 N.J. 122,138, 416 A.2d 37 (1980), our Supreme Court set forth the legal principle that “a business decision will be given its tax effect according to what actually occurred,” and that a taxpayer corporation makes certain business decisions that have certain tax consequences and is then bound by those decisions. The Court held that “a voluntary business decision ‘is to be given its tax effect in accord with what actually occurred and not in accord to what might have occurred.’ ” Id. at 136, 416 A.2d 37 (quoting Comm’r v. Nat’l Alfalfa Dehydrating and Milling Co., 417 U.S. 134, 148, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717, 727 (1974)).
In this case, the parties might have entered into the third amendment so as to render the contract fully executed prior to or before July 1, 2006 within the meaning of N.J.S.A. 46:15-7.4. For example, had the parties entered into the third amendment on or *223 before June 30, 2006 (a Friday), plaintiff might have been eligible for a refund of the RTF paid in connection with the sale of the ITC South Property. However, the parties chose to enter into the third amendment on July 1, 2006 (a Saturday), thereby rendering the contract not fully executed until rather than before that date. While I need not inquire as to why a business decision was made, I cannot ignore or disregard the manner in which and the date on which the parties chose to amend the contract.
The Director’s motion for summary judgment is granted and plaintiff’s motion for summary judgment is denied. Judgment will be entered accordingly.

 In Wells Reit 11-80 Park Plaza, LLC v. Director, Div. of Taxation, 2008 N.J.Tax Lexis 13, *2-*3, 24 N.J.Tax 98, 99-100 (2008), Judge Kuskin described the 1% RTF, or so called “mansion tax," as follows:
The mansion tax is payable in connection with transfers of real property and is in addition to the regular realty transfer fee imposed by N.J.S.A. 46:15-7. The tax is equal to one percent of the entire consideration for the purchase of certain types of real property if the purchase price is in excess of $1,000,000. The tax was enacted by P.L. 2004, c. 66, § 8.
As originally enacted, the mansion tax applied only to transfers of real property classified under N.J.A.C. 18:12-2.2 as Class 2 residential or as Class 3A farm property that included a building or structure for residential use and to transfers of cooperative units. N.J.S.A. 46:15-7.2(a)(l),(2), and (3). Amendments to the statute adopted in 2006, P.L. 2006, c. 33, § 1 expanded the definition of the property to which the one percent tax would apply to include property “that is classified pursuant to the requirements of N.J.A.C. 18:12-2.2 *208 as Class 4A 'commercial properties' that is transferred for consideration in excess of $1,000,000 recited in the deed...." NJ.S.A. 46:15-7.2(a)(4).

 On June 8, 2007, the ITC North Property was conveyed to ITC SCI North Fund, LLP, a single purpose entity similarly established by SCI to purchase and own the ITC North Property, for $20,800,000.

 "Furthermore, 'the court must accept as true all evidence which supports the position of the party defending against the motion and must accord him (or her) the benefit of all legitimate inferences which can be deduced therefrom, and if reasonable minds could differ, the motion must be denied.' ” Alpha I, supra, 19 N.J. Tax at 57 (citing Brill, supra, 142 N.J. at 535, 666 A,2d 146 and Pressler, Current N.J. Court Rules, comment on R. 4:40-2 (1991)).

 The mansion tax is “a fee upon the grantee of a deed for the transfer of real property ... that is classified ... as ... 'commercial propert[yJ.' ” NJ.S.A. 46:15-7.2(a) (emphasis added).

Shifting of risk of payment of mansion tax to seller (South) $ 643,000.00
Absorption of mansion tax by seller (North) 208,000.00
Reduction in price due to delayed closing of second parcel (North) 693,333.00
(see page 12 supra this slip opinion)
$1,544,333.00