[No. 29266-8-I.   Division One.   February 22, 1993.]

MID-TOWN LIMITED PARTNERSHIP, *Respondent*, v. MICHAEL R. PRESTON, ET AL, *Defendants*, CENTRAL AREA YOUTH ASSOCIATION, *Appellant*.

*Jeffrey I. Tilden* and *Perkins Coie,* for appellant.

*Stephen E. DeForest* and *Riddell, Williams, Bullitt & Walkinshaw,* for respondent.

SCHOLFIELD, J. — Central Area Youth Association (CAYA) appeals a judgment for specific performance arising out of a purchase and sale agreement entered into with Thomas Bangasser, involving a commercial building owned by CAYA. We reverse.

## FACTS

The critical facts in this case are not in serious dispute. In the spring of 1988, CAYA owned a building on 23rd Avenue in Seattle, in which it operated bingo games. When the bingo operation became unprofitable, CAYA, through its president, Mary Ann Goe, contacted Thomas Bangasser, whose family owned property on the opposite side of the

street,[1] to see if he or they would be interested in buying the property. Bangasser was interested in the CAYA property, but only as part of the economic upgrading and redevelopment of the area.

On July 26, 1988, CAYA and Bangasser agreed on a price of $406,000 and signed a real estate purchase and sale agreement (sale agreement). The sale was contingent on the purchaser obtaining financing, and the seller conveying title free of all encumbrances. The property was encumbered by a deed of trust in favor of Rainier National Bank, which later became Security Pacific Bank. CAYA owed the bank about $200,000, payable at approximately $2,000 per month.

Following execution of the sale agreement, Mid-Town applied to Security Pacific Bank for financing. Security Pacific moved slowly on the matter because of its concerns about the economic viability of the area. Although it indicated to the parties that it would approve financing, it did not do so by the closing date stated in the sale agreement, October 31, 1988.

Because the sale did not close by October 31, 1988, CAYA obtained an $80,000 construction loan from Security Pacific to pay for relocating the bingo operation to Aurora Avenue. This was a short-term, high interest loan, exacerbating CAYA's cash flow problems. CAYA's monthly payments on the construction loan were approximately $10,000, in addition to the $2,000 monthly payments on the deed of trust.

In late 1988, Mid-Town turned to the City of Seattle for block grant funds, and the City gave Mid-Town a favorable response. However, the City required a letter of credit from a lending institution as security for its loan of block grant funds. Bangasser therefore returned to Security Pacific to secure the required letter of credit. By a telephone call on February 17, 1989, Security Pacific indicated it would approve a loan of approximately $2 million and that a commitment letter would

---

[1]These parcels were transferred to a newly formed family limited partnership, Mid-Town Limited Partnership (Mid-Town). The general partner of Mid-Town is Bangasser & Associates, Inc., whose stock is owned by Tom Bangasser.

be prepared and sent to Mid-Town. During this period, CAYA was still experiencing severe cash flow problems.

Bangasser then prepared an addendum to the sale agreement, dated February 25, 1989, which provided that (a) Mid-Town would pay $12,500 on the 15th day of each month in addition to the $20,000 earnest money promissory note due on closing; (b) Mid-Town would pay the entire balance on or before December 31, 1989; (c) the closing date was changed from October 31, 1988, to March 15, 1989; and (d) all other terms and conditions of the sale agreement remained unchanged.

CAYA did not sign and return the addendum until April 26, 1989, making it necessary to change several of the provisions in the addendum. The monthly payment due date was changed from the 15th to the 1st, and the closing date was changed from March 15, 1989, to June 1, 1989. The June 1, 1989, closing date is a pivotal factor in this appeal.

In early May 1989, Bangasser had actual notice for the first time that there was a due on sale provision in CAYA's deed of trust. Security Pacific refused to waive this provision.

Neither Mid-Town nor CAYA had sufficient funds to overcome the due on sale clause and close the transaction on or before June 1, 1989. By this time, however, the parties' circumstances had changed for the better. Mid-Town had overcome most of its financing problems, CAYA's north end bingo game was making a profit, and CAYA had a paying tenant in the 23rd Avenue property. At about the same time, an escrow was opened up with Northwestern Title Insurance Company. The June 1 date passed without a tender of performance by either party. There is no evidence that the parties had any oral discussions involving an extension or waiver of the June 1 closing date.

In late June 1989, Northwestern Title wrote to ask CAYA to clear two exceptions set forth in its preliminary commitment for title insurance. On June 30, 1989, at Bangasser's request, CAYA, by Mary Ann Goe, provided a written certifi-

cation to Northwestern Title that in August 1988 the board of directors of CAYA approved a motion to proceed with the closing of the sale and that the president and executive director were authorized to sign the final closing documents. Northwestern Title relied upon the written certification to remove the two exceptions.

On September 7, 1989, the closing documents prepared by Northwestern Title were sent to CAYA for the signatures of its officers. CAYA's board met on September 12, 1989, and voted to keep the property and not to sell it to Mid-Town.

Mid-Town brought this action for specific performance and damages. After a bench trial, the court found that the conduct of the parties between July 1988 and August 1989 constituted a mutual extension of the closing date and a waiver of the time is of the essence clause in the sale agreement. The trial judge also found that the conduct of CAYA gave rise to equitable estoppel and/or waiver of the closing date. The court held that CAYA's refusal on September 12, 1989, to close the sale was a material breach of the sale agreement, as amended, and ordered CAYA to specifically perform. Damages in the amount of $27,120.42 plus attorney's fees were awarded to Mid-Town.

CONCLUSIONS OF WAIVER AND ESTOPPEL UNSUPPORTED

CAYA assigns error to finding of fact 22, which, in pertinent part, reads as follows:

> The conduct of Mid-Town and CAYA, through their respective agents, between July 1988 and August 1989, constituted a mutual extension of the closing date of June 1, 1989, and a waiver of the time is of the essence clause, . . .[.]

Error is also assigned to finding of fact 24, which reads as follows:

> The following conduct of CAYA gives rise to equitable estoppel and/or waiver of the closing date: the written extension entered into between the parties extending the closing date from October 31, 1988 to June 1, 1989; and Ms. Goe's letter of June 30, 1989, certifying that the Board of CAYA had met on August 16, 1988, and had decided to proceed with the sale, and that she, as President of CAYA, and Michael Preston, as Execu-

tive Director, had the authority to sign the real estate documents on behalf of CAYA. Goe's letter was sent at the request of Bangasser.

These two findings involve essentially the same subject matter and will be discussed together.

■ It is the function of an appellate court to determine questions of law. If what is in fact a conclusion of law is wrongly denominated a finding of fact, it is subject to review as a conclusion of law. *Local Union 1296, Int'l Ass'n of Firefighters v. Kennewick,* 86 Wn.2d 156, 161-62, 542 P.2d 1252 (1975); *State v. Washington Tug & Barge Co.,* 140 Wash. 613, 621, 250 P. 49 (1926).

■ "Waiver" and "estoppel" are essentially legal conclusions to be drawn from established facts. Where the issue is what inference shall be drawn from facts where the evidence thereon is not in serious dispute, it is reviewed on appeal as a conclusion of law. *Washington Tug & Barge,* at 621. Our function is to determine whether the trial court's conclusions of law, nearly all of which are challenged by CAYA,[2] are supported by the facts.

The absence of a basis for the trial court's conclusions regarding estoppel and waiver can be best demonstrated by addressing the specific grounds for those conclusions listed in finding of fact 24.

The trial court based its conclusions in part on the written extension or addendum entered into between the parties extending the closing date from October 31, 1988, to June 1, 1989. It should first be noted that except for the changes specifically set forth in the addendum, all other terms and provisions of the sale agreement remained in effect. The addendum expressly so provides. This means that the provision making time of the essence remained in full force and

---

[2] Mid-Town contends CAYA's assignments of error are inadequate to raise all issues CAYA argues. We find the assignments and argument based thereon make sufficiently clear the trial court errors being challenged. No prejudice is claimed for the alleged failure to fully comply with RAP 10.3(g) and 10.4(c). Under these circumstances, full review of the issues raised is appropriate. *In re Marriage of Stern,* 57 Wn. App. 707, 710, 789 P.2d 807, *review denied,* 115 Wn.2d 1013 (1990).

effect and that the extension of the closing date was expressly limited to June 1, 1989.

A provision in an agreement making time of the essence is generally treated as evidence of a mutual intent that specified times of performance be strictly enforced. In *Nadeau v. Beers*, 73 Wn.2d 608, 610, 440 P.2d 164 (1968), the court held that when an agreement makes time of the essence, fixes a termination date, and there is no conduct giving rise to estoppel or waiver, the agreement becomes legally defunct upon the stated termination date if performance is not tendered. In accord is *Local 112, I.B.E.W. Bldg. Ass'n v. Tomlinson Dari-Mart, Inc.*, 30 Wn. App. 139, 142, 632 P.2d 911, *review denied*, 96 Wn.2d 1017 (1981). *See also* 6 S. Williston, *Contracts* § 852, at 208-09 (3d ed. 1962), stating as follows:

> [I]f time is made essential by the agreement, neither the vendor nor the purchaser can enforce the contract specifically after the agreed day if it is then still wholly executory on both sides; . . .[.]

(Footnotes omitted.) *See also CHG Int'l, Inc. v. Robin Lee, Inc.*, 35 Wn. App. 512, 514-15, 667 P.2d 1127, *review denied*, 100 Wn.2d 1029 (1983), where the court held that since the condition precedent to the contract was neither performed nor excused within the time required, both parties' contractual duties were discharged.

Time was of the essence of the sale agreement. There is no basis whatever for treating the addendum extending the closing date to June 1, 1989, as somehow demonstrating an intent to extend the life of the agreement to some unknown date beyond June 1. Bangasser concedes in his brief at page 8 that both parties could have declared the transaction terminated on June 2, 1989. No declaration of the obvious by CAYA was necessary. The expiration was automatic.

Waiver is the intentional abandonment or relinquishment of a known right. It must be shown by unequivocal acts or conduct showing an intent to waive, and the conduct must also be inconsistent with any intention other than to waive. *Department of Rev. v. Puget Sound Power & Light*

*Co.*, 103 Wn.2d 501, 505, 694 P.2d 7 (1985). CAYA had the contract right to have the sale agreement closed on or before June 1, 1989. Any conduct waiving the June 1 date had to take place prior to June 1. The addendum occurred prior to June 1, but it was the addendum itself, prepared by Bangasser, which set June 1 as the mutually agreed closing date. The addendum does not support the trial court's finding of a waiver of the closing date.

■ In its findings, the trial court also used the term "equitable estoppel". Estoppel has three elements:

> (1) an admission, statement, or act inconsistent with the claim afterwards asserted, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act.

*Farnam v. CRISTA Ministries*, 116 Wn.2d 659, 678-79, 807 P.2d 830 (1991) (quoting *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 340, 779 P.2d 249 (1989)).

Since the agreement of the parties was set forth in the original sale agreement and the addendum, and there is no evidence of any oral conversations between the parties relating to an extension of the closing date, it is quite apparent that none of the required elements of estoppel are present in this case.

Finding of fact 24 refers to Ms. Goe's letter of June 30, 1989, as a basis for finding a waiver of the closing date or an estoppel to assert the closing date. In this respect, it should be first noted that the letter was not written until June 30, 1989, 29 days after the agreed closing date had expired. Secondly, the letter simply certifies to facts that occurred back on August 16, 1988, which was prior to the initial closing date of October 31, 1988. The letter makes no mention of an extension of a closing date, nor does it make any representation of any kind as to the intentions of CAYA in respect to the then legally defunct sale agreement. Ms. Goe's letter provides no support for a finding of estoppel or waiver on the part of CAYA. At the very most, any justifiable reliance on the June 30 letter by Bangasser could only operate

to create some kind of estoppel to take effect no earlier than the date of the letter. The letter, as a matter of law, could not have the retroactive effect of breathing life into an agreement which became legally defunct 30 days earlier.

Finding of fact 22 refers to the conduct of Mid-Town and CAYA between July 1988 and August 1989 as constituting "a mutual extension of the closing date of June 1, 1989". The finding also refers to the alleged conduct as supporting a waiver of the time is of the essence clause. The first closing date set forth in the original sale agreement was October 31, 1988. Neither the evidence nor the court's findings point to any event which occurred between July 1988 and October 31, 1988, that could have in any way involved the agreed closing date of June 1, 1989, which was not approved by CAYA until it signed the addendum on April 26, 1989.

In finding of fact 23, the trial court acknowledged that upon the expiration of the initial closing date of October 31, 1988, both parties could have walked away from the agreement because, by its own terms, the agreement had expired. This finding appears to be in conflict with the trial court's conclusions in respect to waiver and estoppel. As previously pointed out, Bangasser concedes neither party was bound by the sale agreement after June 1, 1989. It follows that the trial court and Bangasser are relying on events which occurred after June 1, 1989, to support claims of estoppel or waiver. The authorities previously cited establish that once a termination date expires, in the absence of an existing waiver or estoppel the agreement is dead. *Nadeau v. Beers, supra*; *Vacova Co. v. Farrell*, 62 Wn. App. 386, 814 P.2d 255 (1991).

In conclusion of law 2, the trial court concluded that closing did not occur on June 1, 1989, because of CAYA's inability to pay off its $200,000 deed of trust obligation to Security Pacific. This is a completely unsupported conclusion. Paragraph 4 of the original sale agreement gave CAYA, as the seller, the right to discharge all encumbrances from the purchase money at the date of closing. The addendum did not change this provision and, to the contrary, provided that

except as expressly changed in the addendum, all of the terms and conditions of the original sale agreement remained unchanged. Bangasser, in his testimony, acknowledged that it was not contemplated that CAYA would ever have to pay the $200,000, and that it would have been "absurd" for him to think that they could come up with $200,000. The record is clear that CAYA's only obligation in respect to the $200,000 was to pay it out of the proceeds of the sale.

CAYA was never in breach of the sale agreement. It did nothing that could be interpreted as a waiver of the June 1 closing date, nor of the time is of the essence clause. No evidence was presented of actions by CAYA or justifiable reliance thereon by Bangasser that could constitute an estoppel preventing CAYA from enforcing the sale agreement as written, including the June 1, 1989, closing date.

## ATTORNEY'S FEES

The original sale agreement provided that in the event suit was instituted to enforce any rights under the agreement, the successful party would be entitled to an award of court costs and reasonable attorney's fees. Bangasser was awarded attorney's fees in the trial court. CAYA is the prevailing party on appeal and is entitled to its reasonable attorney's fees incurred in the trial court and on appeal.

This case is remanded to the Superior Court for entry of a judgment dismissing the plaintiff's complaint and the awarding to CAYA its reasonable attorney's fees incurred in the trial court and on appeal.

GROSSE and KENNEDY, JJ., concur.

Reconsideration denied April 2, 1993.

Review denied at 122 Wn.2d 1006 (1993).