# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| CRJ KIM, INC., a Washington corporation, | No. 48566-4-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JKI INVESTMENTS, INC., a Washington corporation, and DAVID KIM and JANE KIM, husband and wife and the marital community thereof, | |
| Appellants. | |

MAXA, A.C.J. – JKI Investments, Inc., appeals the trial court's summary judgment order granting CRJ Kim, Inc., specific performance of the parties' purchase and sale agreement (PSA) to sell a Super 8 hotel in Port Angeles. JKI's president, David Kim, also appeals the trial court's ruling denying his summary judgment motion to dismiss CRJ's claim of tortious interference with that contract.

We hold that (1) the PSA was an enforceable contract even though it did not allocate a portion of the purchase price to the hotel property; (2) the PSA's financing addendum, which stated that the PSA would terminate unless CRJ provided notice within 60 days after mutual acceptance of the PSA that it had satisfied or waived a requirement that it obtain new financing, applied to this transaction; (3) JKI neither waived the 60-day notice deadline nor was estopped

from asserting the deadline as grounds for termination even though JKI continued discussions with CRJ's lender after the deadline passed; and (4) David Kim is entitled to summary judgment on CRJ's tortious interference with a contractual relationship claim.

Accordingly, we reverse the trial court's grant of summary judgment in favor of CRJ on its specific performance claim and the denial of David Kim's summary judgment motion on CRJ's tortious interference claim. We remand for entry of judgment in favor of JKI on the specific performance claim and in favor of David Kim on the tortious interference claim. We also hold that JKI is entitled to recover its attorney fees and costs on appeal.

FACTS

*Purchase and Sale Agreement*

On December 31, 2014,[1] CRJ and JKI reached a mutual agreement on the PSA's final terms, which provided that CRJ would pay $3.5 million in exchange for the "commercial real estate and all improvements thereon . . . commonly known as Super 8 Motel; 2104 E. 1st St" in Port Angeles. Clerk's Papers (CP) at 137. The PSA specifically incorporated several attachments, including an amendment with typed and handwritten provisions (the Amendment) and a form document entitled "Financing Addendum." CP at 153-54. Among other provisions, the Amendment contained a covenant not to compete in which JKI agreed not to own or operate a business that competes with the hotel for 60 months. The PSA's purchase price provided consideration for all of the hotel's property, including real property and personal property, as

---

[1] At one point, JKI asserted that December 6 was the appropriate date that the parties reached mutual agreement. However, JKI has conceded that December 31 was the mutual acceptance date. Therefore, December 31, 2014 is the date applicable for summary judgment.

well as the covenant not to compete.[2] The PSA indicated that the sale's closing date would be March 31, 2015.[3]

The PSA did not allocate the purchase price between the real property, personal property, and covenant not to compete. And there is no evidence that the parties ever discussed or even considered allocation when drafting the PSA. The PSA provided a procedure for valuing the personal property included in the sale, but not for valuing the real property, the hotel's goodwill, or the covenant not to compete.

*PSA Financing Provisions*

The body of the PSA, the Amendment, and the Financing Addendum all addressed CRJ's financing. Paragraph 1 of the PSA provided that the purchase price would be payable as "[a]ll cash at closing contingent on new financing in accordance with the Financing Addendum (attach CBA Form PS_FIN)." CP at 137.

The Amendment provided that "[t]his offer is contingent upon Buyer obtaining financing from [a] lender" and that "financing from the lender is subject to satisfactory of [sic] Appraisal, Phase1 [sic] report and Phase 2 report if necessary." CP at 149. The Amendment did not include a time by which CRJ had to comply with this contingency or include a notice requirement.

---

[2] Although the PSA does not expressly account for the business's goodwill, the parties apparently contemplated transfer of that goodwill as well.

[3] The body of the PSA provided a closing date of March 31, 2015. The Amendment stated that the closing date would be February 28, 2015. But a later addendum revised the closing date to March 31, 2015.

The Financing Addendum, denominated as "CBA Form PS_FIN" as referenced in paragraph 1 of the PSA, was a form document that allowed the parties to choose among one of three financing options: new financing, assumption of existing financing, or seller financing. Each option included an empty box the parties could check off, indicating their selection. The parties did not check off any of the Financing Addendum's three options.

The Financing Addendum's new financing section stated that "Buyer's obligations under the [PSA] are contingent on Buyer obtaining new financing." CP at 153. CRJ had to complete a written application for financing within five business days after waiver or satisfaction of the feasibility contingency in paragraph 5 of the PSA, under which contingency CRJ was required to give notice within 60 days of mutual acceptance that it was satisfied with all aspects of the property. The new financing section included a blank for the percent of the purchase price for which CRJ would be required to obtain financing, and "80" was typed in the blank. CP at 153. The new financing section further stated:

> The [PSA] shall terminate and Buyer shall receive a refund of the earnest money unless Buyer gives notice that this condition is satisfied or waived on or before _____ days (60 days, if not completed) following mutual acceptance of the [PSA].

CP at 153. This 60-day period ended on March 2, 2015 based on a mutual acceptance date of December 31, 2014.[4]

*Transaction Activities*

In early February 2015, the parties executed an addendum to the PSA that contained various provisions, including that CRJ would open an escrow with a $50,000 deposit. On

---

[4] Sunday, March 1, 2015 was 60 days from December 31, 2014. However, the contract provided that if an ending date fell on a Saturday, Sunday, or holiday, then the relevant period would end on the next day that was not a Saturday, Sunday, or holiday.

February 12, CRJ signed a notice that it had inspected the hotel and that CRJ agreed to remove the feasibility contingency in paragraph 5 of the PSA. CRJ's real estate broker sent the notice and evidence of the $50,000 escrow deposit to JKI on February 13.

On February 13, CRJ also submitted a loan application to BBCN bank. BBCN responded on February 17 with a letter stating that it was interested in providing financing and stating proposed terms without making any commitment. CRJ's broker notified JKI no later than February 18 that CRJ had applied for financing. JKI's president, David Kim, began communicating with BBCN by February 20. On March 2, the day of the financing notice deadline, David Kim exchanged e-mails with BBCN about financing issues.

CRJ did not provide written notice to JKI before March 2 that the financing contingency had been satisfied or waived. CRJ did not obtain final approval for financing until March 19.

Until March 9, JKI continued to communicate with BBCN via e-mail about providing financial information and access to the hotel's financial information. JKI also continued to work with CRJ, providing information about the hotel's employees and other details about the business.

On March 19, JKI's attorney notified CRJ that JKI considered the PSA to be terminated. The letter cited, among other things, CRJ's failure to provide timely notice as required in the Financing Addendum's new financing provision. Until this time, JKI had given no indication that it did not intend to go forward with the transaction.

CRJ continued to move toward closing and completed the closing documents. On March 24, CRJ provided JKI with a signed addendum to the PSA proposing to allocate $3 million to the real property, $300,000 to the non-compete agreement, $100,000 to goodwill, and $100,000 to

personal property. JKI did not agree to or sign this addendum. CRJ also informed JKI that it had obtained loan approval and approval to obtain a Super 8 Motel franchise and had signed the transaction's closing escrow instructions provided by the parties' escrow agent. Those closing instructions stated that closing could not occur until the parties agreed to an allocation of the purchase price. JKI did not agree to or sign the closing instructions.

Several months later, JKI's real estate agent approached David Kim about the possibility of completing the transaction. David Kim indicated that he was angry with CRJ due to comments CRJ made during a tour of the hotel, which he believed resulted in several employees quitting. David Kim also stated that, because of that hassle and the cost associated with defending CRJ's lawsuit, he would only reconsider selling the hotel if CRJ added $1 million to the purchase price. He also told JKI's agent that "I just do not want to sell to this particular Buyer because I hate him 100%." CP at 376.

*CRJ Lawsuit*

CRJ filed this lawsuit seeking to compel JKI's performance under the PSA and for damages incidental to JKI's delay in closing the sale. In an amended complaint, CRJ added David Kim as a party and asserted a claim for tortious interference with a contractual relationship against him.

The parties filed cross motions for summary judgment. The trial court granted CRJ's motion and denied JKI's motion. The court ruled that the Financing Addendum was part of the PSA, but suggested that the Amendment's financing clause – which had no deadline – prevailed. And the court ruled that even if the 60-day deadline in the Financing Addendum applied, JKI waived that deadline by its conduct after March 2. Therefore, the court ruled that CRJ was

entitled to specific performance of the PSA. The trial court also denied David Kim's motion for summary judgment on the tortious interference with a contractual relationship claim.

JKI appeals the trial court's order.

ANALYSIS

A.    STANDARD OF REVIEW

We review summary judgment orders de novo. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). On summary judgment, we construe all evidence and reasonable inferences in favor of the nonmoving party. *Id.* Summary judgment is appropriate when the record shows "no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." CR 56(c); *see Keck*, 184 Wn.2d at 370. A fact is material if it affects the case's outcome. *Keck*, 184 Wn.2d at 370 n.8. A genuine issue of material fact exists if the evidence would be sufficient for a reasonable jury to find in favor of the nonmoving party. *Id.* at 370. "If reasonable minds can reach only one conclusion on an issue of fact, that issue may be determined on summary judgment." *Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wn. App. 859, 865, 324 P.3d 763 (2014).

On summary judgment, the moving party has the initial burden to show there is no genuine issue of material fact. *Lee v. Metro Parks Tacoma*, 183 Wn. App. 961, 964, 335 P.3d 1014 (2014). A moving defendant can meet this burden by showing that there is an absence of evidence to support the plaintiff's case. *Id.* Once the moving party has made such a showing, the burden shifts to the nonmoving party to set forth specific facts that rebut the moving party's contentions and show a genuine issue of material fact. *Elcon Constr., Inc. v. E. Wash. Univ.*,

174 Wn.2d 157, 169, 273 P.3d 965 (2012). But conclusory statements and speculation submitted by the nonmoving party will not preclude summary judgment. *Id.*

B.    ENFORCEABILITY OF THE PSA

Initially, JKI argues that the PSA is not enforceable because it failed to specify what portion of the purchase price was allocated as consideration for the transaction's real property. We disagree.

1.    Legal Principles

To form a valid contract, both parties must provide an objective manifestation of mutual assent to all material terms. *P.E. Sys., LLC v. CPI Corp.*, 176 Wn.2d 198, 209, 289 P.3d 638 (2012). Similarly, a court can order specific performance when a contract contains all material terms, allowing the court to determine what each party must do to constitute performance. *16th St. Investors, LLC v. Morrison*, 153 Wn. App. 44, 52, 223 P.3d 513 (2009). If a contract does not contain sufficient material terms, a court cannot order specific performance. *See Setterlund v. Firestone*, 104 Wn.2d 24, 27, 700 P.2d 745 (1985). For example, courts have declined to enforce contracts when the parties failed to fill in essential terms left blank in a form document, *id.*, or included in a contract an "agreement to agree" at a later date. *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 179-80, 94 P.3d 945 (2004).

Which terms are material must be determined based on the facts of each individual case. *Setterlund*, 104 Wn.2d at 26-27. In a real estate contract, material terms generally include the contract's subject matter, consideration, and terms of payment. *16th St. Investors*, 153 Wn. App. at 52. More specifically, Washington courts have recognized 13 terms essential to carrying out a real estate contract:

"(a) time and manner for transferring title; (b) procedure for declaring forfeiture; (c) allocation of risk with respect to damage or destruction; (d) insurance provisions; (e) responsibility for: (i) taxes, (ii) repairs, and (iii) water and utilities; (f) restrictions, if any, on: (i) capital improvements, (ii) liens, (iii) removal or replacement of personal property, and (iv) types of use; (g) time and place for monthly payments; and (h) indemnification provisions."

*Id.* at 52 n.5 (quoting *Kruse v. Hemp*, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993)).  The party seeking specific performance has the burden of proving the inclusion of all material terms in the contract.  *Setterlund*, 104 Wn.2d at 27.

2.    Analysis

In this case, neither party disputes that they reached mutual acceptance and therefore objectively agreed to the PSA's terms.  The question is whether the PSA contained all *material* terms.  JKI argues that although the PSA contained the consideration for the entire transaction, allocation of a portion of that consideration to the real property is a material term that was omitted from the PSA.

a.    No Washington Authority Provides that Allocation Is a Material Term

Washington cases establish that subject matter, consideration, and terms of payment of the transaction are the primary material terms.  *16th St. Investors*, 153 Wn. App. at 52.  Here, there was consideration for the transaction – including the transfer of the real property – despite the absence of allocation.

JKI cites no Washington authority for the proposition that that allocation of a portion of a transaction's purchase price to the real property involved is a material term of a real estate contract.  And purchase price allocation is not among the 13 essential terms that Washington courts historically have looked for in a real estate contract.  *See id.* at 52 n.5.  Therefore, Washington law does not support JKI's argument that the PSA is unenforceable.

9

b.      Cases from Other Jurisdictions

JKI argues that courts in other jurisdictions have recognized that allocation is a material term.  However, the cases JKI cites are distinguishable and do not establish allocation as an essential element of a real property contract.  In *Biegler v. Kraft*, the court held that a contract was not formed when the parties, who disagreed on the proper allocation of the purchase price, were unable to agree to terms of an agreement.  924 F. Supp. 2d 1074, 1091-92 (D.S.D. 2013).  But here the parties did not disagree on allocation when drafting the PSA – they did not address allocation at all.  *Biegler* did not address whether allocation is a material term when the parties do not identify allocation as a term to be negotiated.

In *Mission Denver Co. v. Sound Corp. of Colorado*, the court held that a contract was not completed when it included "an agreement that the allocation of the purchase price among assets was to be established and then attached as a schedule to the final contract" and the parties did not provide, among other things, the schedule.  515 P.2d 1151, 1152 (Colo. App. 1973).  But here the parties did not agree to establish an allocation of the purchase price.  *Mission Denver* did not hold that a completed contract is invalid when it does not allocate a portion of the purchase price to the real estate.

In *SCI ITC South Fund, LLC v. Director, Division of Taxation*, the court determined that a change in purchase price occurred when an amendment to a contract for real estate bifurcated the purchase of a property into two pieces, allocating the total purchase price between the two parcels.  24 N.J. Tax 205, 212, 218-19 (2008).  The tax implications of this bifurcation impacted the transaction's total price, and therefore determined when the transaction was dated for the

purposes of a tax refund. *Id.* at 222. But that case did not address whether allocation is a material element of a contract.

c. Extrinsic Evidence

JKI argues that two pieces of extrinsic evidence demonstrate that allocation was a material term of the PSA. First, on March 24 CRJ signed a proposed addendum that provided a purchase price allocation. Second, the closing escrow instructions prepared on March 24 stated that the transaction could not close until the parties had agreed on allocation.

Three reasons suggest that the escrow instructions and allocation addendum are immaterial. First, JKI did not prepare either document. The parties' escrow agent prepared the escrow instructions and CRJ prepared the proposed addendum. Second, JKI did not sign or adopt either document or indicate an intention to be bound by their terms. Third, the documents are dated March 24, five days after JKI repudiated the contract on March 19. Therefore, this extrinsic evidence is not relevant to determining whether allocation is a material term.

d. Tax Considerations

JKI argues that an allocated price for the real property portion of the transaction is necessary for tax purposes. JKI refers to federal and state tax law, arguing that the parties cannot submit the required tax information if they do not agree to an allocation.

But federal and state tax law does not appear to require two parties to a real estate contract to *agree* on purchase price allocation. Federal law provides a "residual method" by which the parties are required to allocate the purchase price. 26 C.F.R. § 1.1060-1(a)(1). And state law does not require parties to agree on how to allocate their purchase price, but instead requires taxpayers to apportion parts of a sale between personal and real property. *See* RCW

82.45.030, .060; Wash. State Dep't of Revenue, *Real Estate Excise Tax Affidavit*, http://dor.wa.gov/docs/forms/realestexcstx/realestextxaffid_e.pdf (requiring personal property, including goodwill, to be subtracted from total selling price to determine real estate tax liability).

e.  Conclusion

Neither Washington authority nor the cases from other jurisdictions that JKI cites establish that allocation of a purchase price is a material element of a contract that contains all the other essential elements.  JKI's extrinsic evidence and tax arguments are not persuasive.  We hold that the PSA contains all material terms and is enforceable despite the absence of a provision allocating a portion of the purchase price to the real property.

C.      APPLICATION OF THE FINANCING NOTICE PROVISION

The new financing section of the Financing Addendum included the requirement that CRJ provide notice within 60 days of mutual agreement that the financing contingency had been satisfied or waived.  There is no dispute that CRJ did not provide the notice required under this provision.  But CRJ argues that the financing notice provision does not apply because (1) the Financing Addendum's new financing option was not checked, and (2) the Financing Addendum's 60-day notice requirement is incompatible with the Amendment's requirement that financing be obtained only after completing an appraisal and two additional reports.  We disagree with CRJ and hold that the Financing Addendum's financing notice provision applies.

1.  Legal Principles

The primary objective in contract interpretation is to ascertain the mutual intent of the parties at the time they executed the contract.  *Int'l Marine Underwriters v. ABCD Marine, LLC*, 179 Wn.2d 274, 282, 313 P.3d 395 (2013).  The focus is on determining the parties' intent based

on the reasonable meaning of the contract language. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). We view the contract as a whole, interpreting particular language in the context of other contract provisions. *See Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 669-70, 15 P.3d 115 (2000). We must attempt to interpret contractual language in a way that gives effect to all provisions. *Realm, Inc. v. City of Olympia*, 168 Wn. App. 1, 5, 277 P.3d 679 (2012). We also attempt to harmonize clauses that appear to conflict in an attempt to give effect to all of the contract's provisions. *Id.*

We may use extrinsic evidence to help determine the parties' intent, while distinguishing the parties' intent during drafting from their arguments during litigation. *Int'l Marine*, 179 Wn.2d at 282. But we cannot use extrinsic evidence to contradict the contract's written terms. *Hearst Commc'ns*, 154 Wn.2d at 503.

A contract provision is ambiguous if its meaning is uncertain or is subject to two or more reasonable interpretations after we analyze the language and consider extrinsic evidence if appropriate. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 713, 334 P.3d 116 (2014). We generally construe ambiguities against the contract's drafter unless the drafter is unknown or the parties drafted the contract together. *Id.* In that situation, we "will adopt the interpretation that is the most reasonable and just." *Id.*

2.    Inclusion of the New Financing Section in the PSA

CRJ argues that the Financing Addendum's new financing section, including the financing notice provision, was not included in the PSA because the parties did not check the box next to that section. We disagree.

Considered in isolation, the fact that the Financing Addendum's new financing option was not checked might indicate that it did not apply. However, considering the PSA as a whole, three factors show that the parties intended to include the new financing section in the PSA.

First, paragraph 1 of the PSA allowed the parties to select among four options when specifying a payment method for the purchase price. They chose the option indicating that payment would be "[a]ll cash at closing contingent on *new financing in accordance with the Financing Addendum* (attach CBA Form PS_FIN)." CP at 137 (emphasis added). The Financing Addendum attached to the PSA was denominated as "CBA Form PS_FIN" as referenced in paragraph 1. CP 153. In other words, the body of the PSA expressly incorporated the Financing Addendum *and* its new financing section.

Second, the parties completed a blank in the new financing section, requiring CRJ to obtain "a loan amount of at least . . . 80% of the purchase price." CP at 153. The parties would not have completed this blank if they did not intend for the new financing section to be included in the PSA.

Third, the parties did not check the box next to *any* of the financing options in the Financing Addendum. The only other potentially operative provision in the Financing Addendum was section 4, which required JKI to cooperate with CRJ to obtain "estoppel certificates or subordination, nondisturbance and attornment agreements" from "non-residential tenants" if required by CRJ or its lender. CP at 154. There is no indication in the record that there were any non-residential tenants at the hotel. Therefore, under CRJ's argument, the terms of the Financing Amendment either were not included in the PSA or were inapplicable to the

14

hotel. It would make little sense for the parties to have attached the Financing Addendum to the PSA if none of its terms applied.[5]

CRJ suggests that there was no need to check any of the financing options in the Financing Addendum because the parties included a financing clause in the Amendment. The implication is that the financing clause in the Amendment superseded the financing clause of the PSA's paragraph 1 and its reference to the Financing Addendum. But there is no indication in the PSA that the Amendment was intended to supersede the Financing Addendum.

CRJ also points out that JKI stated in interrogatory answers and argued in support of summary judgment that the PSA was incomplete and unenforceable because none of the financing options in the Financing Addendum were checked. CRJ argues that these statements confirm that JKI itself did not believe that the Financing Addendum applied.

But we must distinguish between the parties' arguments during litigation and their intent at the time an agreement was drafted. *Int'l Marine*, 179 Wn.2d at 282. We must consider the PSA as a whole in the context of other contract provisions. *See Weyerhaeuser*, 142 Wn.2d at 669-70. In addition, we interpret contractual language in a way that gives effect to all provisions. *Snohomish County Pub. Transp. Benefit Area Corp. v. FirstGroup Am., Inc.*, 173 Wn.2d 829, 840, 271 P.3d 850 (2012). Based on these principles of interpretation, we hold that

---

[5] JKI argues that even if the PSA is ambiguous regarding the inclusion of the new financing section, that ambiguity must be resolved against CRJ because CRJ initially proposed both the Financing Addendum and the Amendment. CRJ disputes this characterization, arguing that both parties essentially drafted the PSA through back and forth negotiations even if CRJ prepared the first draft. We decline to construe the PSA against CRJ.

the parties intended to include the new financing section of the Financing Addendum – including the financing notice provision – in the PSA.

3.   Conflict Between Financing Addendum and Amendment

CRJ argues that even if the Financing Addendum's new financing section was included in the PSA, we should not enforce the financing notice provision because it conflicts with the financing clause in the Amendment.  We disagree that the two provisions conflict.

The Amendment and the Financing Addendum are consistent in that they both provide that CRJ's obligations under the PSA are contingent on CRJ obtaining new financing.  And they each provide additional requirements: obtaining an appraisal and two reports for the Amendment and providing notice within 60 days after mutual acceptance that the financing contingency had been satisfied or waived for the Financing Addendum.  On their face, nothing in these two additional requirements conflict.

CRJ argues that, because the Amendment's reporting requirements are time-consuming and could take more than 60 days to finish, they conflict with the 60-day financing notice provision of the Financing Addendum.  But CRJ presented no evidence regarding how long it would take to obtain the appraisal and reports required in the Amendment or to obtain the financing approval.  Further, CRJ does not argue that it could not have obtained the appraisal, reports, and financing in 60 days.  In fact, CRJ actually received final approval of financing within 35 days of its application to BBCN bank, submitted on February 13, 2015.

In addition, the parties agreed to include in the PSA the financing clauses in both the Amendment and the Financing Addendum.  The Financing Addendum's financing notice provision included a blank where the parties could have inserted a longer time period, but instead

16

they opted to use the default 60-day term. We do not have authority to rewrite contracts that the parties deliberately made for themselves. *McCormick v. Dunn & Black, P.S.,* 140 Wn. App. 873, 891-92, 167 P.3d 610 (2007).

The financing clauses in the Amendment and the Financing Addendum can be interpreted as providing complementary requirements regarding the financing contingency. We must attempt to interpret contractual language in a way that gives effect to all provisions, and must attempt to harmonize clauses that may conflict. *Snohomish County*, 173 Wn.2d at 840; *Realm*, 168 Wn. App. at 5. We hold that the Financing Addendum's financing notice provision is enforceable despite the additional requirements of the Amendment's financing clause.

4. Conclusion

We hold that the Financing Addendum's 60-day financing notice provision applied to this transaction. As a result, the trial court's grant of summary judgment cannot be affirmed on the grounds that financing notice provision was unenforceable. Instead, JKI is entitled to summary judgment based on CRJ's undisputed failure to give the required notice within 60 days unless JKI waived or is estopped from enforcing the financing notice provision.

D.     DEFENSES TO ENFORCEMENT: WAIVER AND ESTOPPEL

JKI argues that under the terms of the Financing Addendum's financing notice provision, CRJ's failure to provide written notice by March 2, 2015 that it had satisfied or waived the financing contingency terminated the PSA. CRJ does not contest that it failed to provide timely notice if the financing notice provision applied. Instead, CRJ argues that JKI either waived by its conduct or is estopped from enforcing the 60-day deadline in the financing notice provision. We disagree.

1. JKI's Conduct

CRJ argues that JKI engaged in the following conduct that demonstrated an intent to waive the 60-day financing notice deadline and estopped JKI from enforcing the deadline:

i. From February 23, 2015 to March 2, 2015, David Kim and Brian Kang (an employee of BBCN, CRJ's lender) exchanged e-mails regarding the hotel's balance sheet. On February 23, Kang sent an e-mail to David Kim stating:

> Please see the Net Income of income statement and Tax return. It is off by $70,000. Please forward to CPA to revised [sic] income statement and prepare separated Balance sheet. Thank you.

CP at 427. On March 2 – the financing notice deadline – David Kim and Kang exchanged a series of e-mails. At 10:00 AM, Kang sent an e-mail stating:

> In order to meet closing date on time, I still need for [sic] seller's 2014 Income Statement and Balance Sheet prepared by CPA. It may delay on Appraisal report and other loan process. We need to have your cooperation to meet your closing date promptly. Thank you.

CP at 323. David Kim replied around 6:00 PM on March 2 and forwarded the text of an e-mail sent to him by his CPA. The CPA's message stated, among other things, that "[i]f the bank still needs 12/31/14 financial statement, I will go ahead and prepare that. Let me know." CP at 431. At 9:00 PM, Kang replied: "Can I contact your cpa and explain. Plz provide autorization [sic] to your cpa." CP at 431.

ii. On March 3 at 2:41 PM, David Kim sent Kang an e-mail stating that "I've given permission to have you and ONLY you talk to my CPA about this matter. They are expecting your call. Your contact person is Seke Jung." CP at 331.

iii. On March 5, David Kim sent an e-mail to his agent, Juliana May, providing a PIP (Property Improvement Plan) as an attachment. This appears to be in response to a requirement

in the PSA that JKI provide the "Latest PIP or Punch list" within 14 days of mutual acceptance. CP at 149.

iv. On March 7, David Kim sent an e-mail to May that included a "memo to buyer" regarding a meeting to meet with CRJ's appraiser. CP at 333. David Kim expressed concern about a previous time a CRJ representative visited the property, which he asserted resulted in employees leaving because of their belief that the business would be sold. In the same e-mail, David Kim noted that CRJ should "minimise [sic] any business impact during the escrow time period." CP at 333.

v. On March 7, May forwarded to David Kim an e-mail from CRJ's agent. The e-mail apparently concerned processing a credit card payment. In an exchange that ended on March 8, David Kim e-mailed May, asking her to fill out an application for "Webvu in addition to prolific." CP at 334. He indicated that Prolific was his credit card processor.

vi. On March 9, CRJ's agent sent May an e-mail indicating that there were three weeks until closing and that CRJ wanted to prepare for taking the business over. CRJ's agent also wanted JKI to get all employees to sign an employment contract with CRJ and to train newly hired employees. May forwarded the e-mail to David Kim. He replied to May, providing recommendations for periodical bonuses for his employees. David Kim also stated that "[i]f the Buyer would like better training to the employees by the Seller, then don't start Buyer training until April 1." CP at 335.

vii.  In response to CRJ's request for admissions, JKI agreed that "[i]n March 2015, JKI Investments, Inc. was still providing to CRJ Kim, Inc. and/or its agent or broker documents described in section 5a of [the PSA]."[6]  CP at 178.

On March 19, JKI's attorney sent CRJ a letter stating that JKI considered the PSA to be terminated.

### 2.    Waiver of 60-Day Deadline

CRJ argues that JKI by its conduct waived the financing notice deadline.  We disagree because a contract party's conduct cannot operate as a waiver of a termination clause after the contract already has terminated by its terms.

#### a.    Legal Principles

The doctrine of waiver applies to all rights and privileges a party is entitled to assert. *Schroeder v. Excelsior Mgmt. Grp., LLC*, 177 Wn.2d 94, 106, 297 P.3d 677 (2013).  Waiver is the intentional and voluntary relinquishment of a known right.  *Id.*  Waiver may be express, but it also may be implied through a party's conduct.  *224 Westlake, LLC v. Engstrom Props., LLC*, 169 Wn. App. 700, 714, 281 P.3d 693 (2012).  Implied waiver occurs when a party's unequivocal acts or conduct demonstrate an intent to waive.  *Id.*  Waiver cannot be implied from a party's ambiguous conduct.  *Id.*  And the party's conduct must be inconsistent with any

---

[6] CRJ also focuses on JKI's original position that mutual acceptance occurred on December 6, 2014, which would have made February 4, 2015 the financing notice deadline.  CRJ points out that the parties executed an addendum on February 7, which was inconsistent with the PSA terminating three days earlier.  CRJ argues that conduct after February 4 demonstrated that JKI waived that deadline.  However, as previously noted, JKI no longer argues that mutual acceptance occurred on December 6.

intention other than waiver. *Edmonson v. Popchoi*, 155 Wn. App. 376, 390, 228 P.3d 780 (2010).

A party to a contract can waive a contractual provision.[7] *See Mike M. Johnson, Inc. v. Spokane County*, 150 Wn.2d 375, 386, 391-92, 78 P.3d 161 (2003) (addressing waiver of contractual protest and claim procedures); *Saili v. Parkland Auto Ctr., Inc.*, 181 Wn. App. 221, 225, 329 P.3d 915 (2014) (addressing waiver of contractual rights to arbitration).

The burden of proving intent to waive is on the party claiming waiver and, because waiver is disfavored, the claimant has a "heavy burden of proof." *Saili*, 181 Wn. App. at 225. Waiver is a mixed question of law and fact. *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 440-41, 191 P.3d 879 (2008). " 'Whether facts on which a claim of waiver is based have been proved, is a question for the trier of the facts, but whether those facts, if proved, amount to a waiver is a question of law.' " *Id.* at 441 (quoting *Advantor Capital Corp. v. Yeary*, 136 F.3d 1259, 1267 (10th Cir. 1998)). When an issue involves a mixed question of law and fact but the facts are not disputed, the issue is a question of law for us to resolve. *Brundridge*, 164 Wn.2d at 441.

---

[7] JKI argues that a party can unilaterally waive only contractual provisions meant for its own benefit and not provisions that benefit both parties, citing *Mike M. Johnson, Inc. v. Spokane County*, 150 Wn.2d 375, 386, 78 P.3d 161 (2003), and *Local 112, I.B.E.W. Building Ass'n v. Tomlinson Dari-Mart, Inc.*, 30 Wn. App. 139, 143, 632 P.2d 911 (1981). Here, the financing notice provision technically was for CRJ's benefit because it could terminate the contract if it did not obtain financing. But the 60-day deadline, which is what CRJ claims that JKI waived, was solely for JKI's benefit.

b.     Reliance on Post-Deadline Conduct

JKI argues that only its actions taken prior to the March 2 deadline are relevant to waiver and estoppel. JKI relies on *Mid-Town Limited Partnership v. Preston*, 69 Wn. App. 227, 848 P.2d 1268 (1993). In that case, the agreed June 1 closing date for the sale of property passed without a tender of performance. *Id.* at 230. The buyer later was prepared to close, but the seller refused. *Id.* at 230-31. The trial court found that the seller waived the June 1 closing deadline based on certain conduct that occurred after June 1 and was therefore estopped from asserting the deadline as grounds for avoiding the sale. *Id.* at 231-32. This conduct included a June 30 letter from the seller certifying that its board of directors a year earlier had approved a motion to proceed with closing. *Id.* at 230-31.

Division One of this court stated that when a contract fixes a termination date and there is no waiver or estoppel, the contract "becomes legally defunct upon the stated termination date." *Id.* at 233. The court therefore concluded that any conduct waiving the June 1 termination date had to occur before June 1. *Id.* at 234. Similarly, the court concluded that the June 30 letter "could not have the retroactive effect of breathing life into an agreement which became legally defunct 30 days earlier." *Id.* at 234-35. The court held that the trial court could not rely on post-termination conduct to establish waiver because "once a termination date expires, in the absence of an existing waiver or estoppel the agreement is dead." *Id.* at 235. The court also noted that once a contract terminates, neither party can specifically enforce that contract. *Id.* at 233.

The court in *Mid-Town* relied on *Nadeau v. Beers*, 73 Wn.2d 608, 440 P.2d 164 (1968). In *Nadeau*, the buyer tendered payment three days after the closing deadline. *Id.* at 609. The sellers, believing the tender was timely, initially indicated that it would accept the payment. *Id.*

When the sellers discovered that the closing deadline had passed, they rejected the tender. *Id.* The trial court ordered specific performance, in part based on a finding that the sellers waived or were estopped from reliance on the closing deadline. *Id.* at 610.

The Supreme Court reversed. *Id.* at 610-11. The court emphasized that the contract had terminated before the buyer tendered payment.

> Payment was not tendered until after the agreement by its terms had expired. Absent conduct giving rise to estoppel or waiver, no further action on the part of [the sellers] was required to effectuate the termination. There is no forfeiture involved, for the agreement, by operation of its time provisions, became legally defunct.

*Id.* at 610. Further, the court concluded that under the circumstances, the sellers' conduct did not constitute a waiver because it did not unequivocally show an intent to waive the closing deadline. *Id.* at 611.

CRJ attempts to distinguish *Mid-Town* because that case involved a closing deadline rather than the financing notice deadline at issue here. However, because expiration of both deadlines resulted in automatic termination, this distinction is not significant. CRJ also notes that *Mid-Town* and *Nadeau* both state that an agreement becomes defunct when the closing deadline passes "[a]bsent conduct giving rise to estoppel or waiver," *Nadeau*, 73 Wn.2d at 610, suggesting that those cases do not specify that the conduct must occur before the closing deadline. But both cases clearly are referring to waiver or estoppel that occurs before termination. In fact, the court in *Mid-Town* refers to an "*existing* waiver or estoppel" at the time of the termination date. 69 Wn. App. at 235 (emphasis added).

CRJ also cites other cases that it claims support a finding of waiver here. But the only case involving a contract deadline addressed conduct that occurred before the applicable deadline

23

expired.  *See Sienkiewicz v. Smith*, 97 Wn.2d 711, 717-18, 649 P.2d 112 (1982) (seller's agents induced the buyer to delay the purchase until after the performance deadline has passed).  The other cited cases clearly are inapplicable.  *See Bowman v. Webster*, 44 Wn.2d 667, 669-71, 269 P.2d 960 (1954) (holding that waiver was appropriate when a buyer who had knowledge of a problem in the amount of property conveyed waited several months before seeking rescission); *Carpenters Trusts of W. Wash. v. Algene Constr. Co.*, 11 Wn. App. 838, 839-41, 525 P.2d 834 (1974) (holding that a collective bargaining agreement did not expire because the parties had a continuing agreement).

Here, the Financing Addendum stated that the PSA "shall terminate" unless, within 60 days after mutual acceptance, CRJ provided notice that the financing contingency had been satisfied or waived.  CP at 153.  Under that provision, when CRJ failed to provide timely notice, the PSA automatically terminated.  The termination clause in the PSA therefore had the same effect as the closing date in *Mid-Town*.

We follow *Mid-Town* and hold that only JKI's conduct occurring before expiration of the 60-day financing notice deadline could constitute a waiver.  Under *Mid-Town*, the PSA terminated by its terms when CRJ failed to provide notice by March 2, 2015 that the financing contingency had been satisfied or waived.  At that point, the PSA was defunct and could not be revived through waiver.

The only conduct before March 2 that CRJ claims constituted waiver was David Kim's ongoing contact with CRJ's lender between February 23 and March 2.  Up until March 2, those communications did not show an unequivocal intent to waive the 60-day deadline.  All communications after 5:00 PM on March 2, which under paragraph 18 of the PSA was when the

60-day deadline expired, are immaterial. Therefore, we hold that CRJ did not create a genuine issue of fact that JKI waived by conduct the 60-day financing notice deadline.

3. Estoppel to Enforce 60-Day Deadline

CRJ briefly suggests that JKI by its conduct is estopped from asserting the deadline as grounds for termination. We disagree because CRJ did not create a genuine issue of fact regarding two of the three elements of equitable estoppel.

a. Legal Principles

Equitable estoppel rests on the principle that a party cannot deny what he or she has already acknowledged. *Nickell v. Southview Homeowners Ass'n*, 167 Wn. App. 42, 53, 271 P.3d 973 (2012). Proving equitable estoppel requires the asserting party to show that (1) another party made an admission, statement, or act inconsistent with a claim it later asserted; (2) the asserting party reasonably relied on that admission, statement, or act; and (3) the asserting party was injured as a result. *Shelcon Constr. Grp., LLC v. Haymond*, 187 Wn. App. 878, 902, 351 P.3d 895 (2015).

Courts disfavor equitable estoppel, and the party asserting estoppel must prove its elements by clear, cogent, and convincing evidence. *Id.* Clear, cogent, and convincing evidence of estoppel exists when occurrence of all three elements has been shown to be highly probable. *Colonial Imps., Inc. v. Carlton Nw., Inc.*, 121 Wn.2d 726, 735, 853 P.2d 913 (1993).

Equitable estoppel is a question for the trier of fact unless the evidence leads to only one reasonable inference. *Id.* at 737. But to avoid summary judgment dismissal when the burden of proof is clear, cogent, and convincing evidence, the party asserting estoppel must present sufficient evidence to meet the highly probable standard. *See Kitsap Bank v. Denley*, 177 Wn.

25

App. 559, 569, 312 P.3d 711 (2013) (applying rule in the context of an undue influence claim). In other words, summary judgment dismissal is appropriate if viewing the evidence in the light most favorable to the nonmoving party, no rational trier of fact could find clear, cogent, and convincing evidence on each element. *Id.* at 570.

#### b. Reliance on Pre-Termination Conduct

Here, CRJ appears to argue that the same conduct that it claims constituted waiver also supports estoppel. Once again, JKI did not engage in any conduct before March 2 that was inconsistent with its later-asserted claim that the PSA had terminated. The court in *Mid-Town* applied the same analysis to both waiver and estoppel, suggesting that a party cannot prove estoppel based on the other party's post-termination conduct. 69 Wn. App. at 234-35.

But we do not necessarily agree that estoppel cannot be based on post-termination conduct. Unlike for waiver, estoppel does not reinstate a deadline that has passed. Instead, estoppel focuses on a party's ability to *enforce* the contract's deadline – here, to assert the deadline as a defense in a breach of contract action. Estoppel would seem to apply when a party's post-termination conduct damages another party who relies on that post-termination conduct.

We assume without deciding that, in some circumstances, estoppel can prevent a party from enforcing termination of a contract based on conduct that occurs after the contract has terminated by its terms. We therefore must consider whether JKI's conduct after March 2 estops it from enforcing the contract's termination clause.

c.  Estoppel Analysis

The question here is whether there are questions of fact in light of the clear, cogent, and convincing evidence standard regarding the three elements of estoppel.

First, CRJ must show that JKI's conduct is inconsistent with its subsequent position that it would not close the transaction. CRJ claims that JKI's continued discussions with CRJ's lender after the financing deadline showed an intent to affirm the PSA. We assume without deciding that there is a question of fact on this element.

Second, CRJ must show that it was reasonable to rely on JKI's conduct as a confirmation that JKI would not enforce the termination provision. JKI never stated that it would close the transaction even though CRJ missed the 60-day financing notice deadline, and JKI's conduct did not necessarily show an intent to close. And a seller's continuing discussions with the buyer's lender after the contract is terminated by its terms is ambiguous conduct and does not necessarily reflect an intent to close regardless of the termination provision.

Further, estoppel applies only if the party claiming injury had no knowledge of the true facts or had no means of acquiring the facts. *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 340, 779 P.2d 249 (1989); *see also Shelcon*, 187 Wn. App. at 902 (stating that "where a party does not know the true facts, reliance is justified only where that party had no means to discover them."). Here, CRJ had the ability to acquire the true facts. If CRJ was unsure whether the Financing Addendum applied, it could have reviewed the PSA or discussed the contract requirement with JKI before changing its position based on JKI's ambiguous conduct. If CRJ was unsure whether JKI intended to close the transaction even though the deadline had passed, it

could have asked JKI for clarification before relying on JKI's ambiguous conduct to its detriment.

Under the facts of this case, we hold that CRJ did not create a genuine issue of fact in light of the clear, cogent, and convincing evidence standard that it reasonably relied on JKI's continued discussions with CRJ's lender after March 2.

Third, CRJ must show that it was injured as a result of JKI's alleged change in position. CRJ argues that it incurred costs in obtaining financing and approval of a hotel franchise. As support, CRJ cites a letter from its attorney indicating that it paid a $24,000 franchise fee and would incur other damages of $500,000 if JKI failed to close. However, CRJ did not submit any evidence showing that it paid the franchise fee after March 2 but before JKI stated on March 19 that the PSA had terminated. Under the PSA, CRJ was obligated to submit a franchise application by February 20, 2015. Further, CRJ did not submit any actual evidence supporting its estimate that it would incur $500,000 in damages if JKI did not close or that those damages were caused by reliance on JKI's conduct after March 2.

CRJ presented no evidence that it changed its position or was harmed by JKI's conduct between March 2 and March 19, as opposed to being harmed by the termination of the PSA. In the absence of evidence showing that JKI's conduct after March 2 caused harm, CRJ cannot show a genuine issue of fact in light of the clear, cogent, and convincing evidence standard regarding the third element of equitable estoppel.

4.     Conclusion

We hold that CRJ has not demonstrated that a genuine issue of material fact exists that JKI waived the 60-day financing notice deadline or should be equitably estopped from asserting

that the agreement had been terminated as a defense to CRJ's breach of contract action. As a result, CRJ has no basis for avoiding JKI's ability to terminate the PSA based on CRJ's undisputed failure to provide the required notice within 60 days. Accordingly, the trial court erred in granting summary judgment in favor of CRJ, and we hold that JKI is entitled to summary judgment on CRJ's specific performance claim.

E.    TORTIOUS INTERFERENCE CLAIM

David Kim argues that the trial court erred in denying his summary judgment motion regarding CRJ's tortious interference with a contractual relationship claim against him. We agree.

1.    Legal Principles

To bring a claim of tortious interference with a contract or business expectancy, a plaintiff must establish three elements: "(1) the existence of a valid contractual relationship of which the defendant has knowledge, (2) intentional interference with an improper motive or by improper means that causes breach or termination of the contractual relationship, and (3) resultant damage." *Elcon Constr.*, 174 Wn.2d at 168. After the plaintiff makes a prima facie case, the burden shifts to the defendant to demonstrate that the interference was privileged or justified. *Moore v. Commercial Aircraft Interiors, LLC*, 168 Wn. App. 502, 509, 278 P.3d 197 (2012).

Under the second element, the motive for the defendant's interference with a contract focuses on factors such as ill will, greed, retaliation, or hostility. *See Elcon*, 174 Wn.2d at 169; Moore, 168 Wn. App. at 509. Improper means involves the method by which a defendant interferes with the contractual relationship, such as taking arbitrary and capricious action or

harassing a party. *See Pleas v. City of Seattle*, 112 Wn.2d 794, 805, 774 P.2d 1158 (1989);

*Moore*, 168 Wn. App. at 509.

A plaintiff can assert a tortious interference claim only against a person who is not a party

to the contract. *Olympic Fish Prods., Inc. v. Lloyd*, 93 Wn.2d 596, 598, 611 P.2d 737 (1980).

"A party to the contract cannot be liable in tort for inducing its own breach." *Id.*; *see also*

*Vasquez v. State*, 94 Wn. App. 976, 989, 974 P.2d 348 (1999) ("[A] party to the relationship

cannot be held liable for tortious interference.").

Because a corporation acts only through its agents, special rules apply to corporate

officers. *Olympic Fish*, 93 Wn.2d at 598-99; *Deep Water Brewing, LLC v. Fairway Res. Ltd.*,

152 Wn. App. 229, 262-63, 215 P.3d 990 (2009). A corporate officer cannot be personally liable

for tortious interference with the corporation's contract if the officer acts for the corporation's

benefit, within the scope of his or her authority, and in good faith. *Olympic Fish*, 93 Wn.2d at

599. Good faith in this context means acting with an intent to benefit the corporation and serve

the corporation's best interests. *Id.* at 599-600. The good faith test prevents officers from

pursuing purely personal goals in breaching a contract. *Id.* at 600. If an officer, acting for the

company's benefit and within the scope of employment, would not have been liable acting as a

party to the contract, he or she is not liable for tortious interference.[8] *Id.*

---

[8] Although a corporate officer's liability for tortious interference should logically be part of the plaintiff's burden of proof, Division Three of this court has treated a corporate officer's good faith as an affirmative defense. *Deep Water Brewing*, 152 Wn. App. at 263-65. Because the result here is the same in either scenario, we do not resolve that issue.

2.    Analysis

In this case, CRJ argues that David Kim's personal animosity demonstrates his bad faith. CRJ cites David Kim's statements to his broker that he "hate[d]" CRJ and that he would only complete the transaction if CRJ paid an additional $1 million. CP at 376. But this is not the type of bad faith *Olympic Fish* was concerned with. For CRJ to bring a prima facie claim against David Kim, it must demonstrate that David Kim did not act for JKI's benefit.

David Kim's communication with his broker suggests that, regardless of his personal dislike for CRJ, he took JKI's interests to heart. In December, 2014, David Kim wrote an e-mail stating that he thought that the property had recently increased in value, making the PSA's terms less attractive. He indicated that he would complete the PSA as negotiated, but if the deal fell through he would be interested in increasing the purchase price. These comments do not demonstrate the type of personal profiteering that *Olympic Fish* requires before a corporate officer's actions will be treated as separate from the corporation itself. *Id.* at 599-600.

CRJ also incorrectly argues that there was no justifiable basis for terminating the PSA. In its termination letter, JKI cited CRJ's failure to comply with the new financing provision's notice requirement as grounds for termination. CRJ's failure to provide notice gave JKI a clear and valid reason for rescinding the PSA. "Exercising one's legal interest in good faith is not improper interference." *Elcon Constr.*, 174 Wn.2d at 168. CRJ has not demonstrated that the termination, which was allowed by the contract, was wrongful for any other reason. *See Moore*, 168 Wn. App. at 510 ("To be improper, interference must be wrongful by some measure beyond the fact of the interference itself.").

We hold that CRJ has not established a prima facie case of tortious interference and reverse the trial court's denial of JKI's motion for summary judgment.

F.     ATTORNEY FEES ON APPEAL

JKI and CRJ both request reasonable attorney fees on appeal under the PSA.  We hold that JKI, as the prevailing party, is entitled to recover its reasonable attorney fees.

Paragraph 21 of the PSA, states that "[i]f Buyer or Seller institutes suit against the other concerning this Agreement, the prevailing party is entitled to reasonably attorneys' fees and expenses."  CP at 144.  When a contract provides for an attorney fee award in the trial court, the party prevailing before this court may seek reasonable attorney fees incurred on appeal.  *First-Citizens Bank & Tr. Co. v. Reikow*, 177 Wn. App. 787, 800, 313 P.3d 1208 (2013); *see also* RAP 18.1.

As the prevailing party, JKI has a contractual right to recover its attorney fees and costs under the terms of the PSA.  Accordingly, we hold that JKI is entitled to recover its attorney fees and costs on appeal.

CONCLUSION

We reverse the trial court's grant of summary judgment in favor of CRJ on its specific performance claim and the denial of David Kim's summary judgment motion on CRJ's tortious interference claim.  We remand for entry of judgment in favor of JKI on the specific performance claim and in favor of David Kim on the tortious interference claim.  We also hold that JKI is entitled to recover its attorney fees and costs on appeal.

No. 48566-4-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, A.C.J.


We concur:

_____
WORSWICK, J.

_____
SUTTON, J.